# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*People v. Donegan*, 2012 IL App (1st) 102325

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAMONT DONEGAN, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-10-2325 |
| Filed<br>Rehearing denied | June 26, 2012<br>July 25, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first degree murder arising from a gang-related shooting was upheld where defense counsel's failure to object to inadmissible testimony, including hearsay and prior inconsistent statements, did not amount to ineffective assistance of counsel, defendant's involvement in a shooting a few days prior to the murder was properly admitted to prove his motive, and defendant forfeited his claim that the trial court violated Supreme Court Rule 431(b) and did not show that the alleged violation was plain error. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-13128; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Shawn O'Toole, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, and Sheilah O'Grady-Krajniak, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE QUINN delivered the judgment of the court, with opinion.

Justices Cunningham and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant, Lamont Donegan, was convicted of first degree murder in the shooting death of Lorne Moseley and subsequently sentenced by the trial court to 27 years in prison. On appeal, defendant contends that: (1) he was denied effective assistance of trial counsel where counsel failed to object to inadmissible testimony; (2) the trial court erred in permitting the State to present evidence of defendant's prior crime; and (3) the trial court violated Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)) in questioning potential jurors. For the reasons set forth below, we affirm.

¶ 2                                I. BACKGROUND

¶ 3    On June 10, 2008, defendant and Keith Pikes were arrested for the August 21, 2006, murder of Lorne Moseley. They were later charged with first degree murder, attempted murder, aggravated battery with a firearm, and aggravated discharge of a firearm. The State's theory of the case was that the shooting was part of an ongoing war between two street gangs, the Four Corner Hustlers and the Gangster Disciples. Specifically, the State contended that defendant was a Four Corner Hustler and that the day before Moseley's murder, defendant shot at Quentez Robinson, a Gangster Disciple, who had ridden a motor scooter into Four Corner's territory. Defendant was then hit by a car driven by Gangster Disciples who had been following Robinson. The State posited that two days later, defendant retaliated by driving into a Gangster Disciple neighborhood with codefendant Pikes, and a third man, Golden Richardson, and shot at a group of people, killing Moseley.

¶ 4    The case proceeded to separate simultaneous jury trials in December 2010. Prior to trial, the State filed a motion *in limine* to introduce evidence that defendant was a gang member and that he had shot at Robinson a few days before killing Moseley, in order to establish motive. The trial court allowed the evidence over defense counsel's objection. The State also sought to introduce statements made by defendant and Pikes to two witnesses before the shooting as reported in the witnesses' handwritten statements and grand jury testimony, also

-2-

to establish motive. The defense objected on the grounds that there was insufficient foundation for those statements, but the trial court found them to be admissible under the coconspirator's exception to the hearsay rule. Lastly, the trial court granted the State's request to introduce statements made by defendant and Pikes describing the shooting to their friends.

¶ 5    At trial, Quentez Robinson testified that he was a Gangster Disciple and that he knew defendant to be a member of a rival gang, the Four Corner Hustlers. On August 18, 2006, Robinson was riding a scooter and being followed in a car by his friends "Cairo," Herbert Lemon, and Brandon Merkson. When Robinson rode into Four Corner territory he saw defendant run out of an alley and start shooting at him. Robinson stated that two days later, on August 20, 2006, he, Moseley, and several other friends were standing in front of a friend's house at 104th Street and Corliss Avenue when a silver, boxy car rode by with the back window down. Robinson saw a hand come out of the rear window and start shooting. Robinson heard 12 to 15 shots that sounded like they were coming from two guns, but he was unable to identify the shooter.

¶ 6    Next, Herbert Lemon testified that he was a Gangster Disciple and was with Robinson on the night he rode a scooter into Four Corner territory. Lemon was riding in the car that was following Robinson and saw defendant shoot at Robinson. He said the car then hit defendant. On the night of the Moseley murder, Lemon was with Moseley and several other people standing in front of a house on 104th Street and Corliss Avenue when a gray, box-like car drove by and shots were fired from it. Lemon said he heard eight or nine shots, looked inside the car, and recognized defendant in the passenger seat and Pikes in the driver's seat and saw both of them shooting. On December 22, 2007, Lemon identified defendant and Pikes in a photo lineup as the shooters.

¶ 7    The State then presented three witnesses, Vernard Crowder, Brandon Merkson, and DeAngelo Coleman, who had given handwritten statements and grand jury testimony before trial but denied some or all of those prior statements at trial. First, Crowder testified that he knew defendant and Pikes and that they were not members of any gang. Crowder said that he could not recall seeing defendant or Pikes on the night Moseley was killed and that he did not hear any gunshots. Crowder acknowledged that he met with Assistant States Attorney (ASA) Aidan O'Connor on January 8, 2008, regarding the Moseley murder, but said that she told him what to say and threatened to charge him if he refused to do so. Crowder also acknowledged that he testified before the grand jury on April 16, 2009, but claimed that he was told that his pending domestic battery case would not be dropped unless he did. The State confronted Crowder with portions of his grand jury testimony and he denied giving the answers in the transcript. Defense counsel objected to the State's request to introduce the transcripts, arguing that they were inadmissible. The trial court reserved ruling on the issue.

¶ 8    Later in the trial, the State called two witnesses to prove up Crowder's prior statements. First, ASA Krista Peterson was called to testify as to Crowder's grand jury testimony. Defense counsel objected on the grounds that parts of Crowder's grand jury testimony included his interpretation of statements made by defendant and Pikes before and after the shooting. The trial court overruled the objection, noting that Crowder had testified and that "[Crowder's] own present sense impressions were some of the things he was talking about,

and he was available for cross-examination."

¶ 9  The transcript of Crowder's grand jury testimony was admitted into evidence and ASA Peterson read the transcript stating, in part, that Crowder testified that he, Pikes, and defendant were Four Corner Hustlers and that in August 2006, their gang was at war with the Gangster Disciples. On the evening of August 20, 2006, Crowder was walking home when he saw defendant and Pikes standing near an older model, four-door, grayish-black Toyota car. Crowder said that defendant was cleaning out the car and that Pikes called him over and asked him if he wanted to go with them to go "handle some business" on Corliss. Crowder said he took this to mean that they were going to harm someone since that was the block where they had previously fought with Gangster Disciples. Crowder told Pikes he did not want to go with them because he was on probation. Crowder then went to his godmother's house and was sitting on the front porch when he heard several gunshots coming from the direction of 105th and Corliss Avenue.

¶ 10  During his grand jury testimony, Crowder further stated that a few days before the Moseley shooting, defendant was hit by a car driven by Gangster Disciples and was angry about it. Two days after the Moseley shooting, Crowder was with defendant and DeAngelo Coleman in a gangway at 107th and Champlain. Defendant had a .45-caliber High Point gun with orange sights and told Crowder that he "can't get caught with a gun because it had a body on Corliss," which Crowder took to mean the Moseley shooting. While they were in the gangway, the police approached and everyone ran. Crowder said that defendant fell and the clip fell out of the gun. Defendant then threw the gun away. When Crowder next saw Pikes in the fall of 2007, Pikes was angry about being shot at "in the behind and said 'Why ain't nobody keeping going over there, finishing what he had left off with?' " Crowder took that to mean the Moseley shooting.

¶ 11  ASA Aidan O'Connor was called to testify as to Crowder's handwritten statement, which she took on January 8, 2008. That statement, which was entered into evidence and published to the jury, was nearly identical in substance to Crowder's grand jury testimony

¶ 12  Next, the State called Brandon Merkson, who testified that in August 2006, he was a member of the Gangster Disciples and that defendant was a member of the Four Corner Hustlers. On the evening of August 19, 2006, Merkson was in a car with Herbert Lemon and a friend called Cairo, and they were following Robinson, who was riding a scooter in the vicinity of 107th and Champlain, which was Four Corner Hustlers territory. Merkson said that he saw a person run into the street and shoot at Robinson four times but could not identify the shooter. Merkson said that the car ran into the shooter, knocking him down, and that they then drove away.

¶ 13  Merskon testified that on December 22, 2007, he was brought to Area 2 police headquarters and gave a handwritten statement to ASA O'Connor, wherein he identified defendant as the man who shot at Robinson. Defense counsel objected when the State began reading from the statement on the grounds of improper impeachment, and the trial court overruled the objection. When asked whether he had told ASA O'Connor that defendant had shot at Robinson, Merkson testified that he told her that he was not sure who the shooter was, but that she had written in his statement that he identified defendant. Merkson also testified

that he appeared before the grand jury on June 17, 2008, and identified defendant as the man who shot at Robinson and Moseley. Defense counsel objected to the State's questions about Merkson's grand jury testimony on the grounds of improper impeachment but was again overruled.

¶ 14    At trial, Merkson also testified that on August 20, 2006, he was at 104th and Corliss with Moseley, Robinson, and other friends when a small gray box-like car approached from 103rd Street. The car slowed down, and Merkson saw flashes from guns coming from inside the car. Merkson said that he recognized defendant in the backseat as one of the shooters but could not identify the driver. On cross-examination, Merkson acknowledged that in his handwritten statement he said that he could not identify the shooters but knew that two guns were being fired. He also stated that the information he gave in his handwritten statement was what the police told him to say and that he was threatened by the police with enhanced charges or more jail time if he did not testify before the grand jury.

¶ 15    Later in the trial, ASA Patrick Keane testified that he presented Merkson to the grand jury on June 17, 2008, and the transcript of that testimony was admitted into evidence and published to the jury. According to that testimony, on August 20, 2006, at about midnight, Merkson was at 10411 South Corliss with Moseley and some other friends when he saw a small, boxy Toyota approach from 103rd Street. The car slowed down and the people inside started shooting in Merkson's direction. Merkson recognized defendant as one of the three people in the car. Two days before the Moseley shooting, Merkson was in a car driven by his friend Cairo that was following Robinson on a scooter. Merkson saw defendant shoot at Robinson and then Cairo hit defendant with the car.

¶ 16    ASA O'Connor testified that she took a handwritten statement from Merkson on December 22, 2007. In that statement, which was admitted into evidence and published to the jury, Merkson identified defendant as a passenger in the car from which the shots were fired.

¶ 17    DeAngelo Coleman testified that he knew defendant and Pikes from the neighborhood and denied that he or defendant was a gang member. Coleman stated that on the day Moseley was killed, he did not speak with defendant or Pikes. Coleman testified that on August 27, 2006, he was "snatched" by the police, who "tried to put something on him" and told him what to say about the Moseley murder. He spoke to an ASA in January 2008, but denied the substance of his handwritten statement and asserted that he only repeated what detectives told him to say. Coleman acknowledged that he testified before the grand jury on April 10, 2008, but said that he did so because he was told that charges against him in a pending case would be dropped. Coleman asserted that the ASA and detectives told him what to say and had him memorize his handwritten statement before going into the grand jury room.

¶ 18    Later in the trial, ASA Jose Villareal testified that he presented Coleman to the grand jury on April 10, 2008. Coleman's grand jury testimony was admitted into evidence and published to the jury. According to that testimony, in August 2006, Coleman was a member of the Four Corner Hustlers, who were at war with the Gangster Disciples. On August 19, 2006, Coleman was standing across from a liquor store at 107th Street when he heard gunshots. Coleman went to see what happened and saw defendant, also a Four Corner

Hustler, lying in the street. Defendant told him that he was hit by a car because he was shooting at Quentez Robinson, a Gangster Disciple. Coleman said that defendant was very upset and said he wanted retaliation, which Coleman took to mean that he wanted to kill a Gangster Disciple but not Robinson specifically.

¶ 19 The next day Coleman saw defendant talking to Pikes about stealing a car to go on a mission. Defendant had a "jiggler" key that would fit any older model Toyota. Later that evening, Coleman was at a store at 107th and Champlain when he saw Pikes pull up in a Toyota Camry. Pikes and defendant cleaned out the car and then defendant went into a gangway to a house where the gang kept guns. Defendant returned with a .45-caliber High Point, which was his own gun, and a .40-caliber "nation gun," which is a gun available for gang members to use. A third man, Golden Richardson, arrived and Coleman saw them drive off, with Pikes driving, defendant in the front passenger seat, and Richardson in the back. Coleman heard defendant say "It's time," which he took to mean time to go kill.

¶ 20 Coleman saw defendant and Pikes together a few days after the Moseley shooting. Defendant said "it was about time we got one." Coleman testified that defendant described the shooting, stating that the three men drove to 105th and Corliss and saw a group of Gangster Disciples. They were going to chase them down on foot, but instead, they slowed down and he and Richardson shot at the crowd from the car. A few days later, Coleman was in a gangway with defendant and others when the police pulled up and everyone fled. Coleman saw defendant fall down and his gun fall out. Later, defendant told Coleman that he threw the gun and that the police found it.

¶ 21 ASA O'Connor testified that she took a handwritten statement from Coleman on January 9, 2008 at Area 2 police headquarters. Coleman's handwritten statement was admitted into evidence and published. In that statement, which was nearly identical to his grand jury testimony, Coleman also said that on the morning of the Moseley shooting defendant told him that someone had to pay, that he was going to kill a Gangster Disciple, and that defendant and Pikes had been talking all day about going over to 104th and Corliss and getting payback.

¶ 22 The jury also heard testimony from several witnesses who investigated the Moseley murder. Chicago police officer Mark Reno testified that on August 22, 2006, he was assigned to a gang investigations unit and was looking for witnesses in the Moseley homicide. At about midnight, he drove into an alley between Champlain Avenue and Cottage Grove Avenue and saw a group of six to ten men running away from his car toward Cottage Grove. Reno stopped the car and chased the men to a residence at 10747 South Cottage Grove, where they were detained. Reno returned to the alley where he first saw the men and found a .45-caliber semiautomatic High Point pistol with orange sights. Reno was unable to determine whose gun it was. When he returned to the police station, he inventoried the gun and sent it to the Illinois State Police lab.

¶ 23 Dr. Valerie Arangelovich, a medical examiner for Cook County, testified that she performed the autopsy on Lorne Moseley and recovered a bullet from the back of Moseley's head, which she gave to the Chicago police department. Forensic investigator Joseph Dunigan testified that he processed the scene of Moseley's murder and recovered cartridge

cases, bullet fragments, and .40- and .45-caliber bullets. William Demuth, a forensic scientist at the Illinois State Police crime lab, testified that the .45-caliber bullets and bullet fragments recovered from the crime scene and the medical examiner's office matched a test bullet fired from the .45-caliber semiautomatic gun that Officer Reno recovered.

¶ 24　　Sergeant Milton Owens testified that on September 2, 2006, he pulled defendant over for failing to stop at a stop sign and took defendant into custody. Owens testified that when he pulled defendant over, he noticed a "jiggler" key in the car's ignition, which Owens said is like a master key that can be used to operate the door locks and ignition in older model Toyota cars.

¶ 25　　Detective Brian Forberg testified that he was assigned to investigate the Moseley murder and that he spoke with Coleman, Lemon, Robinson, Merkson, and Crowder about the shooting. Forberg testified that Lemon identified defendant and Pikes in a photo array as the shooters and Merkson identified defendant. Forberg said that defendant and Pikes were arrested on June 10, 2008 in connection with Moseley's murder.

¶ 26　　The State rested, and the defense presented no witnesses. The jury convicted defendant of first degree murder but found that the State had not proven that defendant personally discharged a firearm. Defendant filed a motion for a new trial, arguing, in part, that the trial court erred in admitting other crimes evidence that defendant shot at Robinson prior to the Moseley shooting; allowing hearsay statements made by Pikes implicating defendant in violation of *Bruton*; allowing the State to read entire grand jury transcripts to the jury, even where the transcripts were nonimpeaching, irrelevant, and prejudicial, and where they included prior consistent statements, in violation of section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1(c) (West 2006)) (Code). The trial court denied the motion for a new trial and subsequently sentenced defendant to 27 years in prison. This appeal followed.

¶ 27　　　　　　　　　　　　　　　II. ANALYSIS

¶ 28　　On appeal, defendant raises three main arguments: (1) he was denied effective assistance of counsel when his trial attorney failed to object to the State's introduction of inadmissible evidence; (2) the trial court erred in permitting the State to present allegations that defendant had shot at Quentez Robinson a few days before Moseley was killed; and (3) the trial court violated Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)), by failing to explain to the jury that defendant did not have to present any evidence and failing to determine whether the jurors understood the four principles contained in the Rule.

¶ 29　　　　　　　　　　　　A. Ineffective Assistance of Counsel

¶ 30　　Defendant identifies six instances where the trial court allowed the State to present inadmissible evidence and argues that he was denied effective assistance of counsel when his attorney failed to properly object. In determining whether a defendant was denied effective assistance of counsel, we apply the familiar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). Under *Strickland*, a defendant must demonstrate that

counsel's performance was deficient and that such deficient performance substantially prejudiced him. *Strickland*, 466 U.S. at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 162 (2001). A defendant must overcome the presumption that counsel's action or inaction was the result of sound trial strategy, which typically does not support a claim of ineffective representation. *People v. Simmons*, 342 Ill. App. 3d 185, 191 (2003). In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A defendant must satisfy both prongs of the *Strickland* test before he can prevail on a claim of ineffective assistance of counsel. *People v. Gillespie*, 407 Ill. App. 3d 113, 132 (2010). However, if the ineffective assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not determine whether counsel's performance was constitutionally deficient. *People v. Mahaffey*, 194 Ill. 2d 154, 175 (2000).

¶ 31    Defendant argues that his trial counsel failed to object to inadmissible evidence and failed to raise the issue in the posttrial motion and that because the evidence was so incriminating, this could not have been part of a reasonable trial strategy. The State asserts that trial counsel did object to the admission of the allegedly improper evidence and that even if counsel's performance was deficient, defendant was not prejudiced. We will first address the admissibility of the challenged evidence and, if the evidence was inadmissible, determine whether counsel properly objected and whether defendant was prejudiced by its admission.

¶ 32                 1. Hearsay Statements Regarding Events
                       Witness Did Not Personally Witness

¶ 33    Defendant first argues that the State improperly introduced the handwritten statements of Vernard Crowder and DeAngelo Coleman, claiming that defendant admitted to shooting at Robinson and killing Moseley, even though neither Crowder nor Coleman personally witnessed those events. The general rule is that hearsay, defined as "an out of court statement *** offered to establish the truth of the matter asserted," is inadmissible at trial. (Internal quotation marks omitted.) *People v. Gonzalez*, 379 Ill. App. 3d 941, 954 (2008). There is an exception for prior inconsistent statements of a testifying witness, which may be admitted to impeach the witness's credibility. *People v. McCarter*, 385 Ill. App. 3d 919, 932 (2008). Section 115-10.1(c) of the Code provides, in relevant part, that a prior inconsistent statement may be offered not just for purposes of impeachment, but as substantive evidence, so long as the witness is subject to cross-examination and the statement:

"(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness[.]" 725 ILCS 5/115-10.1(c) (West 2006).

¶ 34    For the "personal knowledge" requirement of the exception to be satisfied, " 'the witness

whose prior inconsistent statement is being offered into evidence must actually have seen the events which are the subject of that statement.' [Citations.]" *People v. McCarter*, 385 Ill. App. 3d 919, 930 (2008) (quoting *People v. Cooper*, 188 Ill. App. 3d 971, 973 (1989)). Hence, " '[e]xcluded from this definition are statements made to the witness by a third party, where the witness has no firsthand knowledge of the event that is the subject of the statements made by the third party.' " *People v. McCarter*, 358 Ill. App. 3d 919, 930 (2008) (quoting *People v. Morgason*, 311 Ill. App. 3d 1005, 1011 (2000)). That is, the witness must have observed the events being spoken of, rather than hearing about them afterwards. *Morgason*, 311 Ill. App. 3d at 1011.

¶ 35    Here, defendant asserts that Coleman's and Crowder's handwritten statements that defendant admitted to and described the Robinson and Moseley shootings were inadmissible under section 115-10.1(c)(2) because they contained hearsay and neither witness had "personal knowledge" of those shootings. The State concedes that those portions of Crowder's and Coleman's handwritten statements referring to events outside their personal knowledge were not admissible as substantive evidence but contend that they were admissible for impeachment purposes, pursuant to section 115-10.1, which provides, in part, that "Nothing in this Section shall render a prior inconsistent statement inadmissible for purposes of impeachment because such statement *** fails to meet the criteria set forth herein." 725 ILCS 5/115-10.1 (West 2006). The State argues that the statements at issue were admissible as a means of impeaching Coleman's and Crowder's trial testimony and, hence, that any error in admitting them as substantive evidence was harmless. See *People v. Morales*, 281 Ill. App. 3d 695, 701 (1996) (finding that trial court improperly allowed a witness's handwritten statement as substantive evidence but held that error was harmless since statements were admissible to impeach the witness's credibility). Alternatively, the State argues that any error from the improper introduction of testimony as substantive evidence was harmless.

¶ 36    The trial testimony of Coleman and Crowder was inconsistent with their prior statements that the State introduced at trial and those statements dealt with noncollateral matters, both of which are prerequisites to the introduction of evidence as a prior inconsistent statement. Coleman testified that he was unaware of any gang activity in the area, that he did not have any conversations with defendant on the night of Moseley's murder, and that the police "snatched" him and told him what to say, while his handwritten statement described his conversations with defendant on the night of Moseley's murder and denied any police coercion. Similarly, Crowder testified that he did not remember seeing or speaking with defendant or Pikes on the night of Moseley's murder and testified that the police forced him to sign his handwritten statement, while his statement described his conversations with defendant and rebutted his claim of police coercion. However, there is an additional prerequisite to the use of impeachment evidence, which the State does not address in its brief: a party may only impeach its own witness through use of a prior inconsistent statement when the testimony of that witness does "affirmative damage" to the party's case. *People v. Cruz*, 162 Ill. 2d 314, 361 (1994) (citing *People v. Bradford*, 106 Ill. 2d 492, 500 (1985)). The issue of whether the prior inconsistent statements of Coleman and Crowder, as well as Merkson, did affirmative damage to the State's case and therefore, could be used for

impeachment purposes, will be addressed below.

¶ 37    The State also argues that any error from the improper introduction of testimony as substantive evidence is harmless where the same evidence was properly substantively introduced through grand jury testimony, since there is no personal knowledge requirement for grand jury testimony under section 115-10.1(c)(1). For support, the State cites *People v. Morales*, 281 Ill. App. 3d 695 (1996), where the appellate court held that a witness's grand jury testimony was admissible in a murder prosecution as a prior inconsistent statement made under oath at trial, hearing, or other such proceeding, where the witness's trial testimony differed dramatically from his grand jury testimony and the witness was available for cross-examination. The court found that "the jury considered virtually the same evidence substantively with the admission of [the witness's] grand jury testimony," and therefore, there was an "absence of any evidence of prejudice." *Id.* at 701. See also *People v. Harvey*, 366 Ill. App. 3d 910, 921-22 (2006) (holding that improper admission of prior inconsistent handwritten statements was harmless error "because the jury was permitted to consider substantively virtually identical evidence contained in the recanting witnesses' grand jury testimonies").

¶ 38    Similarly, in this case, because the same testimony was properly introduced substantively through Coleman's and Crowder's grand jury testimony, any alleged error by the trial court in permitting the introduction of their handwritten statement was harmless. Therefore, because defendant cannot show that he was prejudiced by this evidence, we find that he has failed to establish a claim of ineffective assistance on these grounds.

¶ 39                            2. Opinion Testimony of Witnesses

¶ 40    Next, defendant asserts that defense counsel was ineffective for failing to object to inadmissible opinion testimony in the handwritten statements and grand jury testimony of Crowder and Coleman. Specifically, defendant contends that after Crowder and Coleman testified that they did not speak with defendant before or after Moseley's murder, the State introduced the handwritten statement and grand jury testimony of Crowder, which stated in part that Pikes told him that he was going to "do some business," meaning that he was "going over there to harm somebody," or "go do a shooting," and that several months later, when Pikes said "why ain't nobody keeping going over there, finishing what he had left off with," he meant Moseley's murder. Defendant also objects to the introduction of Coleman's grand jury testimony and handwritten statement that when Pike said he was going to "get" a car, he meant "steal" a car to do a shooting on Corliss; that when defendant said he wanted retaliation he meant that he wanted to kill someone; that when defendant ran through a gangway, he did so in order to retrieve some guns; and that defendant's statement that "it's time," meant "to go kill."

¶ 41    Defendant argues that under Illinois law, " 'the testimony of a lay witness must be confined to statements of fact of which the witness has personal knowledge.' " *People v. McCarter*, 385 Ill. App. 3d 919, 934 (2008) (quoting *People v. Brown*, 200 Ill. App. 3d 566, 578 (1990)). Hence, while a lay witness may testify to his observations or sensory perceptions, he generally may not give his opinions or interpretations of those observations.

*Brown*, 200 Ill. App. 3d at 578. For instance, in *McCarter*, the appellate court found that the trial court erred in allowing a witness's videotaped testimony wherein she stated that when the defendant said " 'its' going down,' " he meant that he and his codefendant were going to rob the victim and kill him if he refused to give up the money. Another witness testified that he heard the defendant say " 'put that up,' " and that he believed defendant was referring to a gun. *McCarter*, 385 Ill. App. 3d at 933. The court reasoned that the conclusion drawn by the witness was not an obvious one under the facts, but instead required an inferential step that took the statements beyond mere sensory perception or observation and into impermissible opinion testimony by a lay witness. *Id.* at 934.

¶ 42    Our supreme court has recently adopted the Illinois Rules of Evidence. Rule 701, "Opinion Testimony by Lay Witnesses," provides as follows:

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Ill. R. Evid. 701 (eff. Jan. 1, 2011).

¶ 43    In this case, the complained-of statements appear to meet Rule 701's standard for admissibility as the opinions or inferences testified to were rationally based on the perception of the witnesses and were helpful to a clear understanding of the witnesses' testimony or the determination of a fact in issue. Most of the statements were made by the defendant and Pike just prior to the shooting of Moseley. When considering whether a witness's opinion as to what a declarant meant by a statement is admissible under Rule 701, circuit courts should consider the facts, circumstances, and context under which the statement was made. The basis for admitting Pikes' statement made several months after the shooting, "why ain't nobody keeping going over there, finishing what he had left with," is arguably less strong.

¶ 44    The State asserts that even if the opinion testimony of Crowder and Coleman was inadmissible, the record shows that trial counsel objected to those portions of the witnesses' testimony that constituted "opinion testimony" and that defendant failed to show any prejudice because the opinion testimony did not go to "a crucial fact question." *People v. Hooker*, 253 Ill. App. 3d 1075, 1090 (1993). Further, the State argues that "[i]mproper opinion testimony is not necessarily prejudicial where the conclusion or testimony *** is an obvious one." *People v. Crump*, 319 Ill. App. 3d 538, 542 (2001).

¶ 45    The record shows that during Crowder's direct examination, the State confronted him with grand jury testimony that when Pikes said he was going on Corliss to "handle some business" he meant "going over there to harm somebody." Defense counsel objected to the admission of that grand jury testimony, stating, "We are going to object to that question, Judge, as to what he thought." Prior to the testimony of ASA Krista Peterson during which Crowder's grand jury testimony was published, defense counsel again objected on the grounds that his testimony was "the interpretation of a conversation" and what "Vernard Crowder thought that–." The trial court interrupted defense counsel and overruled the objection stating "And Vernard Crowder was here, and he was subject to cross-examination.

*** His own present sense impressions were some of the things he was talking about, and he was available for cross-examination." Prior to Coleman's testimony defense counsel objected to his testifying as to what he thought defendant and Pikes meant when they were talking. The State argues that these objections by trial counsel show that defense counsel's performance was not deficient.

¶ 46 Defendant contends, however, that trial counsel's objections were not sufficiently specific enough to insulate her from a claim of insufficient assistance of counsel. "Objections should be sufficiently specific to inform the court of the ground for the objection, and a general objection, if overruled, will not preserve the issue for review on appeal." *People v. Queen*, 56 Ill. 2d 560, 564 (1974). " 'Objections to evidence should designate the particular testimony considered objectionable and point out the objectionable features complained of. Failure to make proper and timely objection to the admission of evidence claimed to be incompetent or otherwise objectionable *** generally constitutes a waiver of the right to object and cures the error, if any.' " *Queen*, 56 Ill. 2d at 564 (quoting *People v. Trefonas*, 9 Ill. 2d 92, 98 (1956)). Defendant asserts that although trial counsel objected, she failed to cite the rule against lay opinions and, therefore, caused the court to overrule the objection as a "present sense impression." Here, defense trial counsel clearly argued that portions of Crowder's prior statements constituted Crowder's interpretation or opinion as to what Pikes meant. The fact that the trial court overruled defense counsel's objection is not evidence of ineffective assistance.

¶ 47 Even if defense counsel's objections were not specific enough to constitute effective performance, defendant must also show that he was prejudiced by the admission of the impermissible opinion testimony. To meet his burden, defendant must show that the probability that counsel's errors changed the outcome of the case is "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. It is not necessary for defendant to prove by a preponderance of the evidence that the outcome would have been different; rather, defendant need only demonstrate that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Albanese*, 104 Ill. 2d at 525 (quoting *Strickland*, 466 U.S. at 694). In weighing the impact of counsel's errors, we consider the totality of the evidence before the finder of fact. *Strickland*, 466 U.S. at 695. That is, instead of viewing the improper evidence in isolation, the court must look to the ramifications the improper evidence might have had on the factfinder's overall picture of events. *Strickland*, 466 U.S. at 695-96.

¶ 48 In this case, taking into account the totality of the evidence that the State presented to the jury, the errors complained of are not sufficient to undermine confidence in the jury's verdict. See *Albanese*, 104 Ill. 2d at 525 (citing *Strickland*, 466 U.S. at 694). The State recovered a .45-caliber High Point gun that was identified by two witnesses as belonging to defendant. A forensic expert testified that .45-caliber bullets and bullet fragments recovered from the crime scene and which the medical examiner's office recovered from the victim's brain matched a test bullet fired from the gun recovered by the police. Further, two eyewitnesses identified defendant as being one of the shooters in the car. Those witnesses also identified defendant as being in the vicinity at the time of the shooting, even if their testimony regarding what defendant and Pikes said was excluded. Therefore, because the evidence is

-12-

not closely balanced, defendant was not prejudiced by any alleged error on trial counsel's part.

¶ 49                    3. State's Use of Witness's Prior Consistent Statements

¶ 50    Defendant next argues that his counsel was ineffective for failing to object to the State's introduction of Brandon Merkson's entire handwritten statement and grand jury testimony, which were nearly identical to his trial testimony and therefore, should not have been admitted pursuant to the rule against prior consistent statements. During direct examination, Merkson testified that on August 19, 2006, he was in a car that was following Quentez Robinson who was riding a scooter and that when they entered Four Corner Hustler territory someone shot at Robinson. He stated that he could not identify the shooter. Then, over defense counsel's objection, Merkson was confronted with his handwritten statement where he identified defendant as the man who shot at Robinson, but he testified that he told the ASA that he did not know who shot at Robinson. Merkson also testified that he was present when Moseley was killed and identified defendant as one of the shooters. On cross-examination, Merkson stated that the information he gave in his handwritten statement was what the police told him to say and that he was threatened by the police with enhanced charges or more jail time if he did not testify before the grand jury. Later, the trial court permitted the State to publish to the jury Merkson's entire grand jury testimony, where he identified defendant as the man who shot at Robinson and at Moseley and his entire handwritten statement, where he identified defendant in the Robinson shooting but not in the Moseley shooting.

¶ 51    Defendant argues that the trial court should only have admitted those portions of Merkson's grand jury testimony and handwritten statement that were actually inconsistent with his trial testimony, namely, his statement at trial that he could not identify defendant as the man who shot at Robinson. Defendant asserts that by admitting Merkson's entire handwritten statement and the complete transcript of his grand jury testimony, the State was allowed to impermissibly bolster Merkson's testimony.

¶ 52    The general rule is that prior consistent statements of a witness are inadmissible for the purpose of corroborating the witness's trial testimony, because they serve to unfairly enhance the credibility of the witness. *People v. Terry*, 312 Ill. App. 3d 984, 995 (2000). The reason behind this rule has been explained as follows: "The danger in prior consistent statements is that a jury is likely to attach disproportionate significance to them. People tend to believe that which is repeated most often, regardless of its intrinsic merit, and repetition lends credibility to testimony that it might not otherwise deserve." *People v. Smith*, 139 Ill. App. 3d 21, 33 (1985). There are two distinct exceptions to this rule: (1) where the prior consistent statement rebuts a charge that a witness is motivated to testify falsely, and (2) where the prior consistent statement rebuts an allegation of recent fabrication. *People v. Richardson*, 348 Ill. App. 3d 796, 802 (2004). Under the first exception, the prior consistent statement is admissible if it was made before the motive to testify falsely came into existence. *Id*. Under the second exception, a prior consistent statement is admissible if it was made prior to the alleged fabrication. *Id.* A reviewing court will not reverse a trial court's evidentiary ruling

on a prior consistent statement absent an abuse of discretion. *Id.* at 801.

¶ 53    Here, defendant asserts that Merkson's trial testimony mirrored his prior statements in nearly every respect, with the only discrepancy being that at trial, Merkson testified that he was not sure if defendant was the man who shot at Robinson, which contradicted his prior statement, in which he identified defendant as the shooter. Therefore, defendant asserts that only that inconsistent portion of his prior statements should have been admitted into evidence.

¶ 54    The State contends that Merkson's entire handwritten statement and his grand jury testimony were admissible to rebut his testimony that he did not remember telling the police that defendant shot at Robinson and to rebut the inference that his previous statements were coerced. Defendant argues that this exception does not apply, because defense counsel did not argue that Merkson had a motive to falsely implicate defendant in the crime. On cross-examination, defense counsel questioned Merkson about his ability to observe the shooters and the possibility of a mistaken identification. However, Merkson himself raised the issue of lack of memory and coercion. Therefore, the trial court did not err in permitting the State to present Merkson's prior statement and grand jury testimony to rebut his own contention that he could not remember who shot Robinson or that the police told him what to say and coerced him into appearing before the grand jury.

¶ 55                           4. Improper Impeachment of Witnesses
                              With Prior Inconsistent Statements

¶ 56    Next, defendant argues that his trial counsel was ineffective for failing to object to the State's impeachment of Crowder, Coleman, and Merkson with prior inconsistent statements where none of those witnesses did affirmative damage to the State's case. Specifically, defendant contends that after Coleman and Crowder stated on direct examination that they did not speak with defendant and Pikes shortly before the Moseley shooting, the State should not have been permitted to confront them with their prior handwritten statements and grand jury testimony saying that they had because they did no positive damage to the State's case. Similarly, defendant asserts that Merkson did no positive damage to the State's case when he testified that he was not sure if defendant was the man who had shot at Robinson and that by impeaching him with his prior testimony identifying defendant as the shooter, the State was improperly permitted to get those statements before the jury as substantive evidence.

¶ 57    The State may attack the credibility of a witness, even its own witness, by impeaching the witness with a prior inconsistent statement. *People v. Cruz*, 162 Ill. 2d 314, 358 (1994). When the State impeaches its own witness with a prior inconsistent statement the State must show that the witness's trial testimony affirmatively damaged its case. *Id.* (citing *People v. Morgan*, 28 Ill. 2d 55, 63 (1963)). The State contends that a witness's testimony is damaging when the witness disavows their prior grand jury testimony and claims that it was coerced in exchange for a deal on charges pending against the witness. For support, the State cites *People v. Martinez*, 348 Ill. App. 3d 521 (2004), where this court held that "prior testimony need not directly contradict testimony given at trial to be considered 'inconsistent' [citation] and is not limited to direct contradictions but also includes evasive answers, silence, or

-14-

changes in position." *Id.* at 532.

¶ 58　　In this case, as in *Martinez*, the testimony of Crowder and Coleman stating that defendant was not a gang member and that they did not talk to defendant or Pikes around the time that Moseley was killed, and Merkson's testimony that he could not identify defendant as the man who shot at Robinson were changes in position that caused affirmative harm to the prosecution's case. In addition, that harm was exacerbated by the fact that each of those witness's testified at trial that their prior statements were dictated to them by the State or were coerced by the threat of prosecution. Therefore, under the standards set forth in *Cruz* and *Martinez*, the State had a legitimate need to impeach the witnesses' credibility, and thus their prior inconsistent statements were admissible for that purpose. *Cruz*, 162 Ill. 2d at 362. As a result, defendant's claim that his trial counsel's failure to properly object constituted ineffective assistance of counsel has no merit. See *People v. Evans*, 209 Ill. 2d 194, 222 (2004) (holding that where the admission of testimony was not error, "counsel was not deficient for failing to object").

¶ 59　　　　　　　　　　5. Improper Bolstering With Grand Jury
Testimony and Handwritten Statement

¶ 60　　Next, defendant contends that the trial court erred in allowing the State to introduce both the grand jury testimony and handwritten statements of Coleman, Crowder, and Merkson, and that his counsel was ineffective for failing to object to the "needless repetition" of the witnesses' prior statements. Defendant asserts that although the prohibition against bolstering a witness's credibility with consistent statements generally arises in the context of statements that are consistent with a witness's trial testimony, the rationale behind the prohibition applies equally when a prior statement is consistent with another pretrial statement. Therefore, defendant argues, the evidentiary rule prohibiting the substantive use of prior consistent statements should apply equally to the substantive use of any prior inconsistent statement that is consistent with a witness's previously admitted prior inconsistent statement. As defendant acknowledges, this court had rejected the same argument in several previous cases. *People v. Johnson*, 385 Ill. App. 3d 585, 608 (2008); *People v. Maldonado*, 398 Ill. App. 3d 401, 423 (2010); *People v. Perry*, 2011 IL App (1st) 081228; *People v. White*, 2011 IL App (1st) 092852. Defendant argues, however, that these cases are poorly reasoned, because they ignore the bolstering effect that the repetition of prior inconsistent statements can have on each other and therefore, should not be followed by this court.

¶ 61　　This same argument was made in *White* and rejected by this court. In that case, the court acknowledged the "inherent tension" between the admission of multiple prior inconsistent statements as substantive evidence under section 115-10.1 and the rule barring admission of prior statements that bolster trial testimony but rejected the argument that the rule barring prior consistent statements or its " 'underlying rationale' " can easily be "grafted" onto the rules allowing for admission of prior consistent statements. *White*, 2011 IL App (1st) 092852, ¶ 51. The court addressed the distinction between prior consistent and inconsistent statements, stating as follows:

"Courts have long recognized a bar against prior consistent statements, with limited

-15-

exceptions, because these statements serve no purpose other than to bolster trial testimony. [Citation.] Even under the limited exceptions when prior consistent statements are admissible, they cannot be considered as substantive evidence. [Citations.] Prior inconsistent statements stand on very different evidentiary ground.

Prior inconsistent statements are a vital tool to challenge witness credibility by contradicting and discrediting trial testimony. [Citation.] More important to this analysis, if a prior inconsistent statement meets basic requirements of reliability under section 115-10.1, either party in a criminal case may introduce the prior inconsistent statement as substantive evidence. [Citation.] Section 115-10.1 is meant to advance the legislature's goal of 'prevent[ing] a "turncoat witness" from merely denying an earlier statement when that statement was made under circumstances indicating it was likely to be true.' [Citation.]

Thus, while courts have found little value in a prior consistent statement apart from the impermissible bolstering of trial testimony, the legislature has recognized that a prior inconsistent statement not only serves to discredit trial testimony, but may serve as substantive evidence if it meets the requirements of section 115-10.1. While a blanket prohibition (with limited exceptions) makes sense for prior consistent statements, applying that same general bar to inconsistent statements that are consistent with each other would frustrate the legislature's goal of discouraging recanting witnesses. [Citation.] A witness could be questioned as to prior inconsistent statements, but after one is admitted as substantive evidence, the witness would be free to deny other prior statements without a risk that those statements would be admitted as substantive evidence. We conclude that the underlying rationale for the rule against prior consistent statements does not justify obstructing the operation of section 115-10.1." [Citation.] *White*, 2011 IL App (1st) 092852, ¶¶ 51-53.

¶ 62    The *White* court also noted, as have other opinions addressing the issue, that "just because a jury can consider a witness's prior inconsistent statements as substantive evidence under section 115-10.1, this does not mean that the door is flung open to admit prior inconsistent statements "without limit," as defendants suggest. The trial judge may "exercise discretion to limit the number of such statements that may be introduced." (Internal quotation marks omitted.) *White*, 2011 IL App (1st) 092852, ¶ 54.

¶ 63    Defendant has raised no new argument in this case. Therefore, based on the holdings in *White* and the prior cases that have addressed the admission of multiple prior inconsistent statements, we find that the trial court did not err in allowing the State to introduce both the grand jury testimony and handwritten statement of Coleman, Crowder, and Merkson, and that counsel was not deficient for failing to object to its admission. See *Evans*, 209 Ill. 2d at 222 (where admission of testimony was not error, "counsel was not deficient for failing to object").

¶ 64                6. Coconspirator's Incriminating Hearsay

¶ 65    Defendant next argues that his counsel was ineffective for failing to object when the trial court allowed the State to admit into evidence a statement by Keith Pikes to DeAngelo

Coleman after the shooting, describing how he drove the car and defendant shot at a crowd of Gangster Disciples and a statement by Pikes to Vernard Crowder complaining that nobody finished the "business he left." Defendant asserts that the trial court erred in finding that those statements were admissible under the coconspirator exception to the hearsay rule and further, that allowing Pikes' statements to be used against him violated his due process rights and the confrontation clause, which prohibits the introduction of testimony that a nontestifying codefendant implicated the defendant in a crime. See *Bruton v. United States*, 391 U.S. 123, 136 (1968).

¶ 66    First, with regard to Pikes' statement to Crowder, it does not mention defendant or implicate him in the crime, and therefore, it does not constitute a *Bruton* violation. As for Pikes' statement to Coleman, the trial court admitted it on the grounds that it fell under the coconspirator exception to the hearsay rule. Pursuant to that exception, any declaration by one coconspirator is admissible against all coconspirators where the declaration was made during the course of and in furtherance of the conspiracy. *People v. Kliner*, 185 Ill. 2d 81, 140-41 (1998). Statements made in furtherance of a conspiracy include those that have the effect of advising, encouraging, aiding or abetting its perpetration. *Id.* at 141. Statements that are made after the crime, in an effort to conceal the conspiracy may also fall under the exception. *Id.* at 142.

¶ 67    In this case, the statements Pike made to Coleman after the Moseley murder should not have been admitted under the coconspirator's exception to the hearsay rule because they were made after the crime occurred and therefore were not in furtherance of a conspiracy and were not made in an effort to conceal the crime since they were, in fact, a recitation of the crime. However, another exception to the hearsay rule permits the introduction of otherwise inadmissible hearsay if it constitutes an admission by a defendant, either express or tacit. See *People v. Soto*, 342 Ill. App. 3d 1005, 1013 (2003). The necessary elements for admissibility under the tacit admission rule are (1) that defendant heard the incriminating statement, (2) that defendant had an opportunity to reply and remained silent, and (3) that the incriminating statement was such that the natural reaction of an innocent person would be to deny it. *Id.* (citing *People v. Goswami*, 237 Ill. App. 3d 532, 536 (1992)), which relied upon *People v. McCain*, 29 Ill. 2d 132 (1963). For an excellent discussion of the tacit admission rule, see Robert J. Steigmann & Lori A. Nicholson, Illinois Evidence Manual § 11:36 (4th ed. 2006).

¶ 68    Here, in his handwritten statement Coleman said that he saw defendant and Pikes together the day after the Moseley shooting and that Pikes said that he "drove slowly down the block and that they shot at the group and that [defendant] began to fire the minute they saw the GDs and they were quote 'blasting.' " Coleman further stated that "[defendant] also talked about the shooting saying, quote 'We got one last night. About time we got one.' He states that [defendant] also said that they rode around in the car and saw a big pack of GDs wearing white T-shirts and that Keith drove slow to keep on target with the group of GDs who were scattering. He states that [defendant] say he was quote 'all out the window' shooting at the GDs." Therefore, it is clear that Pikes' statement to Coleman describing defendant's role in the shooting satisfies the requirements of the tacit admission rule: (1) defendant was present during the conversation, (2) the accusation, that defendant shot at a crowd, was such that the natural reaction of an innocent person would be to deny, and (3)

defendant not only remained silent but confirmed Pikes' description of the shooting. Therefore, the trial court did not err in admitting Pikes' statement to Coleman into evidence.

¶ 69    Further, even if the trial court had erred in admitting Pikes' statement, the error was harmless. In *People v. Wilson*, 302 Ill. App. 3d 499 (1998), the trial court erroneously allowed evidence of a codefendant's confessions that implicated the defendant. The appellate court held that the error was harmless and reversal was not warranted because the same evidence was otherwise admissible through grand jury testimony or for impeachment purposes and the evidence only constituted a small portion of the evidence against the defendant. *Id.* at 511-12. Similarly, in this case because statements by defendant that he shot at a group of Gangster Disciples was otherwise properly admissible through grand jury testimony, the trial court's error in admitting Pikes' statement to Coleman was harmless.

¶ 70                      B. Evidence of Defendant's Prior Crime

¶ 71    Defendant's next contention is that the trial court erred in allowing evidence at trial as to defendant's prior crime, namely, his shooting at Quentez Robinson a few days before the Moseley murder. The State contends that this evidence was admissible to show defendant's motive for shooting at a crowd that included Robinson and other Gangster Disciples. Defendant argues that "because the motive was established by other evidence, and because the shooting was a violent crime similar to the charged offense that portrayed defendant as an evil person, the evidence was more prejudicial than probative, and therefore inadmissible."

¶ 72    Generally, evidence of other crimes committed by a defendant is not admissible if its relevancy is limited merely to establishing a propensity to commit crime. *People v. Kliner*, 185 Ill. 2d 81, 146 (1998). This is because "[s]uch evidence overpersuades the jury, which might convict the defendant only because it feels he or she is a bad person deserving punishment." *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980). Such evidence is admissible if it is "relevant to prove any material question other than the defendant's propensity to commit crime, including *modus operandi,* intent, identity, motive, or absence of mistake." *Kliner*, 185 Ill. 2d at 146. When evidence of other crimes is offered, even if relevant for a permissible purpose, it may be excluded if its prejudicial effect substantially outweighs its probative value. *People v. Heard*, 187 Ill. 2d 36, 58 (1999). A trial court should exclude other crimes evidence when the prejudicial effect substantially outweighs the probative value. *People v. Illgen*, 145 Ill. 2d 353, 365 (1991). The admissibility of other crimes evidence rests within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. Where it is relevant and admissible, it must not become a focal point of the trial. *People v. Thigpen*, 306 Ill. App. 3d 29, 37 (1995). The trial court should prevent a "mini-trial" of a collateral offense. *People v. Nunley,* 271 Ill. App. 3d 427, 432 (1995). This can be accomplished by the careful limitation of the details of the other crimes to what is necessary to "illuminate the issue for which the other crime was introduced." *Id.* at 432.

¶ 73    Here, defendant asserts that evidence regarding the Robinson shooting was inadmissible because, contrary to the State's assertion, it was not offered to establish motive. The purported motive for shooting at Moseley was the long-standing gang war and the fact that

defendant was angry about being hit by a car driven by Gangster Disciples a few days earlier. Defendant asserts that it is illogical and untenable to argue that defendant's motive for shooting Moseley was that defendant had previously shot at Robinson. Therefore, defendant argues, the trial court erred in finding that the probative value of this evidence outweighed its prejudicial effect. We disagree. While it is true that defendant was seeking revenge for being hit by a car driven by Gangster Disciples, that incident was of a piece with the Robinson shooting and the ongoing war between the two gangs. The incident as a whole was relevant to establish defendant's motive for doing a drive-by shooting in a Gangster Disciple neighborhood, which resulted in Moseley's death.

¶ 74      Further, Robinson was standing with Moseley when defendant shot and killed Moseley. Clearly, defendant could have been shooting at Robinson, just as he had done two days previously. The fact that 10 to 15 shots were fired at the group of people including Moseley and Robinson also supports the inference that defendant was not merely shooting at Moseley. Robinson's presence as a potential target also supports the admission of defendant's prior shooting at Robinson as it goes to the identification of defendant as the shooter of Moseley. Therefore, we find that the trial court did not abuse its discretion in allowing the testimony as to defendant's prior crime.

¶ 75      Alternatively, defendant contends that even if evidence about the Robinson shooting was admissible for a proper purpose, the way in which it was presented warranted reversal. Defendant relies on *People v. Bedoya*, 325 Ill. App. 3d 926 (2001). In *Bedoya*, defendant was charged with the shooting death of a bouncer during a struggle outside of a bar in Chicago. The State introduced other crimes evidence showing that defendant fired gunshots at three buildings from a car earlier in the evening. The appellate court held that, even if the evidence had a proper purpose, the manner in which the State presented it warranted a reversal. The court noted that the State presented the evidence in "excruciating detail," introducing 7 witnesses and 27 exhibits to support its claim that defendant fired a gun from a car at three buildings as evidence of the defendant's mental state at the time he shot the bouncer. The court also noted that Bedoya had been found not guilty of the prior shootings. In essence, the court found, the State "was allowed to 'put on a trial within a trial,' a practice warned against [by our supreme court]." *Id*. at 940. "The detail and repetition presented to the jury had nothing to do with the purported purpose of the evidence–proof of Bedoya's intent and the absence of accident." *Id.* at 940-41. Further, the court held that the trial court erred in failing to instruct the jury on the limited purpose of the testimony regarding the earlier shootings at the time it was presented. *Id*. at 940.

¶ 76      Similarly, defendant argues, in this case the State presented eight witnesses who testified about defendant's involvement in the Robinson shooting and in essence, created a mini-trial on that issue, that resulted in a shift of the jury's focus to the other crime, increasing the odds of conviction based on something other than proof of his involvement in the Moseley murder. Therefore, defendant asserts, this court should find that the prejudicial manner in which the State focused the jury's attention on the prior shooting deprived defendant of a fair trial.

¶ 77      The facts in this case are inapposite from those in *Bedoya* and, therefore, do not support defendant's argument. Here, unlike in *Bedoya*, the defendant's prior crime did not involve

a random shooting unrelated to the subsequent crime. Defendant initially shot at Robinson because he was a Four Corner Hustler who had ridden into Gangster Disciple territory. Defendant was then hit by a car driven by other Four Corner Hustlers. Two days later, defendant participated in a drive-by shooting at a group of people that included members of the rival gang, including Robinson and two of the men who were in the car that hit defendant. All of this evidence was necessary to establish the ongoing gang war and the defendant's motive for the shooting that resulted in Moseley's death. Further, in *Bedoya*, the witnesses who had testified to the prior shootings did not witness and were unable to testify as to the crime defendant was charged with. Conversely, in this case, five of the witnesses who testified about the Robinson shooting were also present at and able to testify about the Moseley shooting. The *Bedoya* court concluded that "the State was unable to bridge the 'threshold of similarity' required for admissibility of other offense evidence." *Bedoya*, 325 Ill. App. 3d at 940. Here, given that the witnesses were able to testify as to both crimes, the State was able to bridge that threshold. In addition, unlike in *Bedoya*, the evidence about the Robinson shooting was not presented in "excruciating detail" but was merely presented to give the jury a picture of the events that led up to the drive-by shooting. Therefore, we find that the trial court did not abuse its discretion in allowing the testimony as to the Robinson shooting.

¶ 78                                           C. Rule 431(b)

¶ 79    Lastly, defendant contends that the trial court violated Illinois Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)), by failing to properly explain to potential jurors during voir dire that defendant did not have to present any evidence and failing to determine whether the jurors understood the principles set forth in *People v. Zehr*, 103 Ill. 2d 472 (1984). Where an issue concerns compliance with a supreme court rule, review is *de novo*. *People v. Ware*, 407 Ill. App. 3d 315, 353 (2011).

¶ 80    Effective May 1, 2007, the supreme court amended Rule 431(b), deleting the language "[i]f requested by the defendant," and leaving the remainder unchanged. Rule 431(b) now reads:

    "(b) The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

    The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

¶ 81    Thus, Rule 431(b) imposes a *sua sponte* duty on the circuit court to question each potential juror as to whether he or she understands and accepts the *Zehr* principles. Such

questioning of the potential jurors is no longer dependent upon a request by defense counsel.

¶ 82    Defendant contends that the circuit court violated Rule 431(b) by failing to determine whether potential jurors understood and accepted the principle that he did not have to present any evidence on his own behalf and failing to determine if the venire understood the remaining three principles and instead asking whether they "had any problem" with them. Defendant concedes that he did not object to the circuit court's alleged failure to comply with Rule 431(b) but asserts that this court should review the issue under the plain-error doctrine because he was prejudiced in light of the closely balanced evidence in the case.

¶ 83    Our supreme court recently addressed these issues in *People v. Thompson*, 238 Ill. 2d 598 (2010). In *Thompson*, the defendant, Angelo Thompson, was convicted of aggravated unlawful use of a weapon and sentenced to one year in prison. *Id.* at 601. On appeal, Thompson argued his conviction should be reversed because the trial court failed to comply with Rule 431(b). *Id.* at 605. Specifically, the trial court did not question whether any of the prospective jurors understood and accepted that Thompson was not required to produce any evidence on his own behalf. *Id.* at 607. Further, the trial court did not ask the prospective jurors whether they accepted the presumption of innocence. *Id.* Thompson did not object to the alleged Rule 431(b) violation or include it in his posttrial motion, but the appellate court found the alleged error was subject to plain-error review. *Id.* at 605. The appellate court held that the trial court committed reversible error by failing to comply with Rule 431(b) and so reversed Thompson's conviction and remanded for a new trial. *Id.*

¶ 84    The supreme court reversed the appellate court. Thompson did not argue plain error under the first prong, but only argued under the second prong that the Rule 431(b) violation infringed his right to an impartial jury and thereby affected the fairness of his trial and the integrity of the judicial process. *Id.* at 613. The supreme court disagreed, noting it had equated the second prong of plain-error review with structural error. *Id.* at 613-14 (quoting *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009)). The supreme court held:

"A finding that defendant was tried by a biased jury would certainly satisfy the second prong of plain-error review because it would affect his right to a fair trial and challenge the integrity of the judicial process. Critically, however, defendant has not presented any evidence that the jury was biased in this case. Defendant has the burden of persuasion on this issue. We cannot presume the jury was biased simply because the trial court erred in conducting the Rule 431(b) questioning.

        ***

Our amendment to Rule 431(b) does not indicate that compliance with the rule is now indispensable to a fair trial. As we have explained, the failure to conduct Rule 431(b) questioning does not necessarily result in a biased jury, regardless of whether that questioning is mandatory or permissive under our rule. Although the amendment to the rule serves to promote the selection of an impartial jury by making questioning mandatory, Rule 431(b) questioning is only one method of helping to ensure the selection of an impartial jury. [Citation.] It is not the only means of achieving that objective. A violation of Rule 431(b) does not implicate a fundamental right or constitutional protection, but only involves a violation of this court's rules. [Citation.] Despite our

-21-

amendment to the rule, we cannot conclude that Rule 431(b) questioning is indispensable to the selection of an impartial jury." *Id.* at 614-15.

¶ 85     The supreme court noted, in the case before it, the prospective jurors had received some, but not all, of the required Rule 431(b) questioning and had been admonished and instructed on Rule 431(b) principles. *Id.* at 615. The supreme court concluded that Thompson had not established that the trial court's violation of Rule 431(b) resulted in a biased jury and, therefore, he failed to meet his burden of showing the error affected the fairness of his trial and the integrity of the judicial process. *Id.* Finally, the supreme court declined Thompson's request to adopt a bright-line rule of reversal for any violation of Rule 431(b) to ensure that the trial courts will comply with the rule. *Id.* at 615-16.

¶ 86     In the present case, as in *Thompson,* defendant's failure to object at trial constituted a forfeiture of the circuit court's alleged error in its Rule 431(b) questioning. As in *Thompson,* defendant has failed to establish that the forfeiture rule should be relaxed under the *Sprinkle* doctrine (*People v. Sprinkle*, 27 Ill. 2d 398, 400-03 (1963)), as there is no indication the trial court would have ignored an objection nor is there any evidence the trial court overstepped its authority in the presence of the jury. Further, defendant has failed to establish plain error. Contrary to defendant's assertion, the case was not closely balanced. Two eyewitnesses, Herbert Lemon and Brandon Merkson, identified defendant in a photo array during the police investigation and at trial as one of the men who was in the car firing into a crowd on the night Moseley was killed. William Demuth, a forensic scientist, testified that the bullet recovered from Moseley's body and bullets recovered from the crime scene were fired from a .45-caliber High Point semiautomatic with orange sights that the police recovered. Crowder and Coleman testified that the .45-caliber High Point was defendant's personal gun and that it was in defendant's possession immediately before it was recovered by the police. Therefore, the alleged error is not reversible under the first prong. Nor is the alleged error reversible under the second prong. Defendant has presented no evidence the jury was biased in this case. Defendant bears the burden of persuasion on this issue, and we "cannot presume the jury was biased." *Thompson*, 238 Ill. 2d at 614. In the absence of any evidence of jury bias, defendant has failed to meet his burden of showing that the alleged Rule 431(b) violation constituted plain error.

¶ 87                          III. CONCLUSION

¶ 88     For the foregoing reason, we affirm the circuit court.

¶ 89     Affirmed.