# Illinois Official Reports

## Appellate Court

*People v. McLaurin*, 2015 IL App (1st) 131362

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARKELL McLAURIN, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-13-1362 |
| Filed | May 4, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-15116; the Hon. Michael Brown, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Thomas A. Lilien, and Jessica Wynne Arizo, all of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Kathleen Warnick, and Yvette Loizon, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.<br>Presiding Justice Delort and Justice Harris concurred in the judgment and opinion. |

¶ 1      Following a second jury trial in the circuit court of Cook County, defendant Markell McLaurin was convicted of first-degree murder. Subsequently, at a hearing on the defendant's posttrial motion for a new trial, the trial court denied the defendant's *pro se* claims of ineffective assistance of counsel and sentenced him to 60 years of imprisonment. On first direct appeal, the defendant raised four issues by arguing that: (1) defense counsel was ineffective because he failed to secure the testimony of eyewitness Timothy Williams through section 3 of the Uniform Act to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings (Witness Attendance Act) (725 ILCS 220/3 (West 2008)); (2) defense counsel was ineffective for failing to object to the admission of, and failing to request the redaction of, inadmissible statements in State witness Marlon Williams' prior written statement and grand jury testimony; (3) the trial court abused its discretion when it allowed the jury to receive and review a portion of witness Marlon Williams' prior written statement that contained other-crimes evidence disclosing that the defendant "carries different types of guns"; and (4) the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) because it did not "provide each juror an opportunity to respond" to specific questions regarding the *Zehr* principles (*People v. Zehr*, 103 Ill. 2d 472 (1984)). This court remanded the case to the trial court for the limited purpose of conducting a more complete inquiry so as to allow the court to evaluate the defendant's claims for ineffective assistance of counsel, but did not address the defendant's remaining issues on first appeal. See *People v. McLaurin*, 2012 IL App (1st) 102943. On remand, the trial court conducted another hearing, found the defendant's *pro se* ineffective assistance of counsel claim to be without merit, and again denied the defendant's *pro se* motion for a new trial. In the instant second appeal, the defendant raises the same issues that he raised in his first appeal. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 2                        BACKGROUND

¶ 3      The relevant underlying facts of this case were set forth in this court's December 10, 2012 opinion on the defendant's first appeal (*McLaurin*, 2012 IL App (1st) 102943), which we reproduce as follows. On January 9, 2008, Demarlon Jernigan (victim), who was shot in the area of Pulaski Road and Division Street in Chicago, and died of multiple gunshot wounds. After an investigation, the police arrested the defendant, who was charged with six counts of first-degree murder related to the shooting. On February 1, 2010, before the defendant's trial was set to commence, defense counsel sought a continuance stating that he was unable to locate defense witness Timothy Williams (Timothy). The State, also interested in Timothy, informed the trial court that it desired to subpoena him, but had been unsuccessful in serving him at his last known address. Defense counsel stated that he had not subpoenaed Timothy and told the trial court that he had "no excuse other than schedule and workload" for not serving Timothy with a subpoena prior to the trial date. Defense counsel made a proffer that Timothy would testify that neither the defendant nor State witness Bruce Jackson (Jackson) was at the scene of the shooting. Defense counsel also stated that Timothy was unable to identify the actual shooter. The trial court granted the continuance until March 8, 2010, stating that the defendant deserved to have a lawyer who would investigate his case, and further commented that defense counsel's efforts to locate Timothy up to that time were "not due diligence."

¶ 4        On March 8, 2010, the defendant's first jury trial commenced. On March 10, 2010, after the State rested its case-in-chief, the trial court questioned defense counsel about whether Timothy would testify. Defense counsel informed the court that Timothy had contacted him the prior morning stating that he was in Chicago and that he would testify, but he then later left a message indicating that he needed a ride to court. Defense counsel received Timothy's message when the trial broke for lunch and he attempted to return Timothy's call multiple times that day. Defense counsel told the court that Timothy did not answer the telephone. Timothy ultimately did not appear in court that day or at any time during the trial. When the trial court asked defense counsel if he had subpoenaed Timothy, defense counsel responded, "he did not tell me where he was, and I did not have time to secure an investigator to locate him in Iowa, I believe he stated [*sic*] he was living." The following day, defense counsel confirmed that Timothy would not be present in court. The case then proceeded to closing argument. On March 12, 2010, the trial court declared a mistrial after the jury was hung and could not reach a verdict.

¶ 5        On June 7, 2010, the defendant's second jury trial began. Both sides agreed to adopt the trial court's ruling on the motions *in limine* from the first jury trial, in which the court ruled that evidence of the victim's gang membership was inadmissible. There was no discussion in the second trial concerning whether Timothy would appear as a defense witness. Defense counsel indicated there would be no change to his witness list from the previous trial, and the trial court informed the venire that Timothy was a potential witness in the case.

¶ 6        During *voir dire*, the trial court instructed the venire on the four *Zehr* principles and asked whether they "had any problems" with the first three principles. The court also asked, "[i]f the defendant decides not to testify, is there anyone here who believes that regardless of what I have just said, you would hold that decision against the defendant?" None of the members of the venire answered in the affirmative.

¶ 7        State witness Jackee Suttle (Suttle) testified that she was the victim's girlfriend. At about 9 p.m. on January 9, 2008, she and the victim intended to go to a restaurant together near Pulaski and Division. They also had plans to meet their friend, Jackson, who was going to prison the next morning. While conversing with friends near the restaurant, the victim became involved in a verbal altercation with a "big heavy guy." The victim and the "big heavy guy" headed to a nearby park and engaged in a fistfight. After the fight, the victim left the park in a vehicle driven by his friend, Timothy, but returned to the Pulaski and Division area at 10 p.m. From inside the restaurant, Suttle observed the victim walking toward a liquor store across the street from the restaurant. She then heard "five or six" shots fired. Suttle walked outside and observed the victim running away on Division. She saw the victim "taking bullets" and "getting shot," but did not observe the shooter. She testified that she did not observe Timothy or the "big heavy guy" at the crime scene, even though she had testified during the first trial that both were present at the scene of the shooting. Suttle also testified that she did not observe Jackson at the crime scene that night, but could not say for sure that Jackson was not there, because her attention was focused on her wounded boyfriend. After the victim was shot, she went over to his wounded body, which was near the bus stop at Pulaski and Division. His body was covered by a brown jacket, but he had been wearing a red jacket when she was with him earlier in the day. Although she accompanied the police to the police station, she did not speak to the police that night because she was upset. She returned to the police station a week and a half later.

¶ 8        Jackson testified that his relationship with the victim was "something like brothers" and that they were together every day. On the night of the shooting, he dropped the victim off at Pulaski and Division "in the evening or something like that" and did not hear from the victim for about two or three hours. The victim called him because "[h]e had said that he was out there and some boys was trying to fight him or something like that, he didn't want to fight them." Jackson drove to the Division and Pulaski area to pick up the victim and parked his vehicle on Pulaski. Jackson approached the victim as he was crossing the street to enter the liquor store. Jackson "was walking right behind [the victim]" at a distance of a few feet. There were people by the liquor store, and after Jackson and the victim arrived at the liquor store, Jackson heard shots and observed everyone running. Jackson then observed a gun, which looked like a revolver and was "chrome or a silver like" with a black handle. He also observed the shooter's face in good light from a "car length" away. In court, Jackson identified the defendant as the shooter. He testified that though he fled when the shots first rang out, he observed the defendant shoot the victim. Jackson heard four or five shots, chased the defendant for awhile, until Jackson ran into police officers who had arrived at the scene. He told the police officers which way the defendant ran, but the police did not pursue the defendant. Instead, they attended to the victim. Jackson did not talk to the police about the shooter's identity on the night of the shooting because he was upset and mad at the police for not pursuing the shooter more vigorously. He further testified that the victim later died. On January 10, 2008, the next morning, he reported to the Illinois Department of Corrections, to serve his sentence on an unrelated matter. He did not speak to the police until April 1, 2008, after his release in "mid-March" 2008. Jackson testified that at the police station on April 1, 2008, he identified the defendant after a discussion with detectives. On July 10, 2008, he identified the defendant in a lineup.

¶ 9        Marlon Williams (Marlon) testified that he was currently in the custody of the Stateville Correctional Center, serving time for a 2009 conviction for aggravated unlawful use of a weapon. He testified that he was not in the Pulaski and Division area when the victim was shot in 2008, did not know the victim, and did not observe anyone get shot on January 9, 2008. Marlon also did not remember giving a written statement to Assistant State's Attorney Beth Pfeiffer (ASA Pfeiffer) and Detective Roger Sandoval (Detective Sandoval) on February 22, 2008, about what he saw on the night of the shooting. He claimed the signature on the statement attributed and presented to him in court was not his. Moreover, he did not remember signing the document, having it read back to him, or testifying in front of a grand jury.

¶ 10       Emmanuel Bass (Bass) testified that he was in the custody of the Stateville Correctional Center where he was serving a six-year sentence for delivery of a controlled substance. On January 9, 2008, he was in the area of Pulaski and Division "selling weed," when he observed the victim in a fistfight with a man named "Reesie" in a nearby park. He did not observe who won the fistfight, but he observed that the victim walked out of the park, left the area, and returned about 20 minutes later. Bass recalled testifying before the grand jury that the victim knocked Reesie out. Bass testified that Reesie was drinking after the fight and remained in the area. He did not observe the defendant walk up to the victim and start shooting. However, at this second jury trial, the prosecutor asked Bass to read excerpts from his grand jury testimony. Bass read portions of his grand jury testimony that indicated that he had previously testified that he did observe the defendant shoot the victim. Bass said he recalled testifying before the grand jury that he observed the defendant shoot the victim, but testified at the instant second

trial that he heard about the shooting from people in the neighborhood. When asked at the second trial about his grand jury testimony, Bass explained that much of it was not true. Bass further testified that Detective Sandoval promised him that he would be released from jail if Bass revealed what he had heard from the neighborhood. In his grand jury testimony, Bass testified that no promises were made to him. However, at the second trial, Bass did not recall testifying before the grand jury that no promises were made to him. Bass testified that after his grand jury testimony, he told his defense counsel, who was an assistant public defender, to contact the State's Attorney to tell her that Detective Sandoval promised him that he would be released if he told the grand jury what the police wanted. Bass explained that he did not tell the State's Attorney before the grand jury proceeding because he was worried that he would lose the deal he made with Detective Sandoval, who had told him not to say anything about the promise. Bass did not receive any help after his grand jury testimony and subsequently was sent to prison to serve his full six-year term.

¶ 11    ASA Pfeiffer testified that on February 22, 2008, after meeting with detectives, she met with Marlon to hear what he had to say about the shooting. ASA Pfeiffer did not want Marlon to be under the impression that their conversation would lead to anything regarding his pending case. She denied speaking to him about his pending case, and also denied that Detective Sandoval, who was present at the meeting, spoke to him about his case. She obtained Marlon's written statement in which he explained "what he heard said a couple of days after the murder" of the victim. ASA Pfeiffer further testified that Marlon's written statement explained that no threats or promises were made to him in exchange for the statement. Regarding the night of January 9, 2008, Marlon's statement explained that about 8 p.m., he was with the defendant and others when he observed the victim and Reesie in a fight over a girl. After the fight, the victim left the area but Reesie remained nearby. About 45 minutes later, Marlon was standing near Pulaski and Division when he observed the victim and friends walk across the street toward a liquor store. Marlon then heard someone say, "he's got a banger on him." Marlon then heard some gunshots in front of the liquor store and observed the defendant holding a gun with fire coming out of it. The victim was running away from the defendant, but the defendant followed him and fired a total of six to eight shots at him. After the shooting, the defendant placed the gun in his waistband and fled the scene. The written statement also stated that Marlon had "seen [the defendant] with a gun before. [The defendant] carries different types of guns, 9 millimeters, automatics and revolvers." The written statement also said:

> "A day and a half later Marlon saw [the defendant] in the same area Marlon had been on January 9, 2008, on Keystone and Thomas. Marlon was in a car with [the defendant], Little Joe, and another guy Marlon did not know. The guy Marlon did not know told [the defendant], 'yeah, you stretched buddy' to [the defendant] and everyone was laughing. [The defendant] just sat back looking and nodding his head. By saying 'you stretched buddy,' that means he killed him. That's the last time Marlon saw [the defendant]."

¶ 12    As Marlon's written statement was admitted into evidence and published to the jury in the second trial, defense counsel objected to the portion of the statement that described the defendant carrying other guns, on the grounds that it was inadmissible other-crimes evidence. The State responded that it had no objection to refraining from reading that portion of the statement to the jury. However, the trial court ruled that when the written statement was to be

given to the jury, there would be no alterations because Marlon's testimony raised the issue of whether he had actually signed the document. The trial court also rejected defense counsel's request to alter the document to exclude the portions regarding other-crimes evidence because such evidence is admissible for "any other purpose than propensity." Ultimately, the State did not read the objectionable portion of the written statement to the jury. However, it was not redacted from the written statement given to the jury during deliberations.

¶ 13    Assistant State's Attorney Mary Anna Planey (ASA Planey) testified that on March 10, 2008, she spoke to Bass about the events of January 9, 2008. ASA Planey read parts of Bass's grand jury testimony. The portions she read were the same as the portions about which Bass was questioned in his earlier testimony. Specifically, ASA Planey read parts of Bass's grand jury testimony that stated that Bass never told ASA Planey that he did not actually witness the events recounted in his grand jury testimony and that Bass was not told what to say before the grand jury. ASA Planey testified that she did not know what the detectives had talked to Bass about before she met with him. ASA Planey also testified that she met with Marlon on April 11, 2008, before Marlon testified before the grand jury and that Marlon never mentioned anything about a promise from a detective. He told her things that "he'd actually seen." ASA Planey then read parts of Marlon's grand jury testimony, which was substantially similar to the written statement mentioned in ASA Pfeiffer's testimony, except that Marlon's grand jury testimony did not recount the defendant's nodding after the unknown individual stated that the defendant had "stretched buddy."

¶ 14    Dr. James Filkins (Dr. Filkins) testified that he performed the autopsy on the victim's body on January 10, 2008, and opined that the victim died of multiple gunshot wounds.

¶ 15    Officer Michael Edens (Officer Edens) testified that he worked in the gang enforcement unit. On January 30, 2008, he arrested Marlon after executing a search warrant of his residence and recovering 22 grams of crack cocaine, along with drug paraphernalia. At the police station, Marlon told police officers that he had information about a homicide that occurred earlier that month near Pulaski and Division, prompting Officer Edens to contact detectives. Officer Edens had no further conversation with Marlon about the homicide. Officer Edens did not promise Marlon anything for information about the homicide and told Marlon that, regardless of what information he gave, the charges against him would stand. Marlon had not asked Officer Edens if he could do anything about his pending charges, and Officer Edens had not known Marlon before the arrest. Officer Edens did not tell Marlon that he would charge him with home invasion if he did not provide information about the shooting.

¶ 16    Officer Jerry Pentimone (Officer Pentimone) testified that he arrested Bass for a narcotics offense on February 13, 2008. Officer Pentimone asked Bass about his knowledge of criminal activity, and Bass told him that he had information about the shooting and a home invasion near the same location. Officer Pentimone did not promise Bass any leniency for this information, but Officer Pentimone admitted that Bass might have requested leniency.

¶ 17    Detective Sandoval testified that he and Detective Carlos Cortez (Detective Cortez) interviewed Marlon on January 30, 2008. Marlon told the detectives that he witnessed a shooting at Pulaski and Division on January 9, 2008, and did not request any leniency in exchange for the information. Detective Sandoval did not threaten to charge Marlon with home invasion, did not promise him anything in exchange for information, and had no contact with Marlon prior to the January 30, 2008 interview. Detective Sandoval was present when ASA Pfeiffer obtained Marlon's written statement, and he observed Marlon sign the statement.

Detectives Sandoval and Cortez also interviewed Bass on February 13, 2008. Detective Sandoval did not promise Bass anything and had no contact with Bass prior to the interview. He neither told Bass what to say to the grand jury nor told him that he had to be a witness at the grand jury proceedings. Bass gave the detectives information about the shooting and stated that he witnessed the shooting.

¶ 18    Detective Cortez testified that he attempted to interview Suttle on January 9, 2008, but she was too distraught. He eventually interviewed her on January 17, 2008. Suttle told him that she heard from other people that the defendant was the shooter. On January 30, 2008, Detective Cortez interviewed Marlon, who told him that the person who shot the victim was named "Kell." Detective Cortez then searched a database using that name and found a picture matching the information that Marlon had provided. He showed the photograph to Marlon during the interview and Marlon identified the person as "Kell," the person who shot the victim. "Kell" is the defendant's nickname. Detective Cortez testified that he did not have any contact with Marlon prior to the interview, did not promise him anything in exchange for the information, and did not promise Marlon that he would make Marlon's case disappear if he provided information. Detective Cortez further testified that he interviewed Jackson at the police station on April 1, 2008. Jackson told the detective that he witnessed the shooting but did not know the name of the shooter. Jackson identified the defendant as the shooter in a photographic array. On June 9, 2008, Detective Cortez arrested the defendant in a park near Pulaski and Division. On July 10, 2008, Jackson identified the defendant as the shooter from an in-person lineup.

¶ 19    After the conclusion of Detective Cortez's testimony, the State then rested its case in the second jury trial. The defense proceeded by way of stipulation that Suttle had testified at a prior proceeding in which she identified "Reesie" as the "big heavy guy" who was present at the shooting. The defendant did not testify on his own behalf.

¶ 20    After closing arguments, the parties discussed which exhibits would go to the jury. Defense counsel objected to the jury receiving Marlon's complete handwritten statement and the transcripts of Marlon's and Bass's grand jury proceedings. The trial court ruled that Marlon's written statement would go to the jury in its entirety so that the jury would be able to determine whether Marlon actually made the statement. The trial court ruled that the grand jury transcripts would be provided only if requested by the jurors. After jury deliberations began, the jury requested and received the grand jury transcripts of Marlon's and Bass's testimony.

¶ 21    On June 11, 2010, the jury found the defendant guilty of first-degree murder and found that he personally discharged a firearm that proximately caused the victim's death.

¶ 22    On July 6, 2010, defense counsel filed a posttrial motion for a new trial. At the hearing on the motion for a new trial, the defendant requested a new attorney for his posttrial motions and raised *pro se* claims of ineffective assistance of counsel. The trial court explained that it would hear the defendant's claims, and if his claims were sufficient, it would appoint other counsel to represent him in a proceeding for ineffective assistance of counsel. The following colloquy then ensued:

> "THE DEFENDANT: Well, I feel that Mr. Miraglia didn't properly investigate the case and he stated himself during the proceedings, that he didn't know what anyone would testify to and so forth. You yourself, Your Honor, stated that he was ineffective.
>
> THE COURT: When did I say that?

THE DEFENDANT: I can't recall the exact date in which you stated this, Your Honor, but you yourself asked him, was you going to report himself [*sic*]?

MR. MIRAGLIA [defense counsel]: There was a date judge, that the State answered ready and I asked for a date because I hadn't subpoenaed a witness and we had a conversation.

THE COURT: All right. I recall that.

\* \* \*

THE COURT: Now, when we were talking about failing to subpoena a witness, who was that witness?

THE DEFENDANT: Timothy Williams.

THE COURT: Timothy Williams. And tell me what Mr. Williams would have testified to.

\* \* \*

THE DEFENDANT: He would have testified that he was there, he was with [the victim] during the time that [the victim] was shot. He never saw me there and he never saw [Jackson] there.

THE COURT: And how do you know that he would have testified to that?

THE DEFENDANT: Mr. Miraglia.

MR. MIRAGLIA: It was in the police reports, and I talked to him and he did inform me that he would come after the case was continued because Mr. Williams was not under subpoena. I was able to locate him out of state. I never served him but I did talk to him by phone. He guaranteed me that he would be in court during the trial and he never came.

\* \* \*

THE COURT: All right. Mr. McLaurin, there are two aspects to a charge of ineffective assistance of counsel. The first is whether or not the lawyer's performance fell below an objective standard, not that you didn't like the result but would a reasonably competent lawyer have behaved in a different way such that Mr. Miraglia's conduct fell below that standard. In other words, good lawyers don't do this. And the second part of ineffective assistance of counsel is that you're prejudiced as a result of that deficient performance. And so with that view and understanding that lawyers have the ability to make certain choices, they have to have the ability to make certain representations, they have to have the ability to set a strategy, that's what they're allowed to do. \*\*\*

With that in mind let's take those issues. When you say that Mr. Miraglia didn't properly investigate the case because he didn't subpoena this witness, the power of the Court to subpoena a witness is within the Court's jurisdiction, that is the State of Illinois. The State nor no one else can require an out-of-state person to be served with a subpoena, and come in. There may be some mechanism to do that, but if the person is outside of the State of Illinois, they can't be served with a subpoena, and that was the case of Mr. Williams.

Mr. Williams was outside of the state. Your lawyer was in contact with him. He was aware of what Mr. Williams could have testified to and Mr. Williams told him that he would come in. However, he didn't come in. \*\*\*

I don't think that your lawyer failed to investigate your case just because he couldn't get in a witness who wasn't coming in from out of state. He told Mr. Miraglia one thing and it didn't happen. This trial took several days and he didn't come in. You've got to remember this is a retrial. He had an opportunity to come in the first time. He had an opportunity to come in the second time from out of state. He didn't.

\* \* \*

As a result based on everything that I've heard you say, I don't think that we need to go any farther on your *pro se* motion for ineffective assistance of counsel. I'm not going to appoint another lawyer because you haven't made a showing at this point."

¶ 23    Defense counsel then argued the motion for a new trial, emphasizing Marlon's and Bass's lack of credibility. He also argued that the State had not laid the proper foundations to admit the entirety of Marlon's and Bass's prior statements into evidence. On September 17, 2010, the trial court denied the motion for a new trial, and sentenced the defendant to 60 years in prison. The defendant then filed his first direct appeal before this court, raising the four issues outlined.

¶ 24    On December 10, 2012, this court remanded the case to the trial court for the limited purpose of conducting a more complete inquiry, pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), into the efforts taken by defense counsel to investigate Timothy as a witness and to secure his testimony for the *second* trial. See *McLaurin*, 2012 IL App (1st) 102943, ¶ 53. Specifically, this court found that the inquiry conducted by the trial court at the posttrial hearing was inadequate, noting that the information discussed during the trial court's inquiry was already known to the court because it pertained only to defense counsel's efforts to locate Timothy *before* the first trial, and that the trial court failed to inquire about defense counsel's efforts to locate Timothy for the defendant's *second* trial. *Id.* ¶ 52. Moreover, this court found that the trial court's comments at the posttrial hearing suggested that the court was unaware of the Witness Attendance Act (725 ILCS 220/3 (West 2008)), by which an out-of-state witness may be made to appear in an Illinois court. *McLaurin*, 2012 IL App (1st) 102943, ¶ 47. In light of our ruling, this court did not reach the merits of the remaining issues on the first appeal.

¶ 25    On remand, the trial court conducted a *Krankel* inquiry on April 16, 2013, found that the defendant's *pro se* claim of ineffective assistance of counsel was without merit, and again denied the defendant's motion for a new trial.

¶ 26    On April 16, 2013, the defendant filed a timely notice of appeal. Accordingly, this court has jurisdiction.

¶ 27                                                    ANALYSIS

¶ 28    In this instant second appeal, the defendant raises the same issues that he originally raised in his first appeal. We determine the following issues: (1) whether defense counsel was ineffective for failing to present Timothy's testimony at the second trial; (2) whether defense counsel was ineffective for failing to object to the admission of, and request a redaction of, opinion testimony contained in Marlon's prior written statement and grand jury testimony; (3) whether the trial court erroneously admitted other-crimes evidence at trial when it allowed the

jury to receive and review a portion of Marlon's prior written statement disclosing that the defendant "carries different types of guns"; and (4) whether the trial court failed to comply with the requirements of Illinois Supreme Court Rule 431(b) (eff. May 1, 2007).

¶ 29    We first determine whether defense counsel was ineffective for failing to present Timothy's testimony at the second trial.

¶ 30    The defendant argues that defense counsel was ineffective because he failed to present Timothy's testimony at the second trial. The defendant claims that Timothy would have testified that Timothy was present during the shooting but that he did not see either the defendant or Jackson at the crime scene. The defendant contends that Timothy's testimony would have provided crucial support for his defense and refuted the testimony of Jackson. In the alternative, the defendant argues that this court should remand the case for a third inquiry for defense counsel to explain what his efforts were in securing Timothy's presence and testimony prior to the second trial.

¶ 31    The State counters that the defendant cannot show that defense counsel's performance was deficient or that he suffered prejudice. The State contends that the defendant's alternative argument for another remand should be rejected, where the trial court's *Krankel* inquiry on remand was sufficient and a second remand for the same purpose is unnecessary.

¶ 32    To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was deficient and (2) counsel's actions resulted in prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Under the first prong, a defendant must demonstrate that his attorney's performance fell below an objective standard of reasonableness. *Evans*, 209 Ill. 2d at 220. Under the second prong, prejudice is shown where there is a reasonable probability that the result would have been different but for counsel's alleged deficiency. *Id.* Failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697.

¶ 33    In the case at bar, on remand from this court's December 10, 2012 ruling that the trial court's initial inquiry into the defendant's *pro se* ineffective assistance of counsel claim was inadequate, the trial court conducted a *Krankel* hearing on April 16, 2013. At the April 16, 2013 hearing, the trial court acknowledged the reasoning behind this court's remandment and questioned defense counsel about his attempts to contact Timothy for "this trial." Defense counsel informed the court that he obtained Timothy's mobile number and had "several" conversations with Timothy, but that Timothy never disclosed his location to defense counsel. The State also informed the court that the State's investigator was unsuccessful in locating Timothy and that the State had absolutely no information as to Timothy's whereabouts. The trial court then questioned defense counsel as to whether he had developed any information from any source as to Timothy's whereabouts, to which defense counsel answered in the negative. Defense counsel stated that Timothy had indicated that he was located outside of Illinois, that he would come to Chicago on "the day of trial," that he would be available to testify for the defense, but that he never came to Chicago "on the date of trial." Defense counsel further noted that he spoke with Timothy on the morning of trial, that counsel called Timothy when Timothy failed to arrive in court, but that Timothy did not answer the telephone at that point. In making its ruling, the trial court noted that it was mindful of the Witness Attendance Act, but that the statute's requirements could not be complied with where neither the State nor defense counsel knew of Timothy's whereabouts. As such, the trial court found

defense counsel diligent in his efforts "to arrange for the attendance of [Timothy]," rejected the defendant's *pro se* claim of ineffective assistance of counsel as "without merit," and again denied the defendant's motion for a new trial.

¶ 34    We find that the trial court did not err in concluding that the defendant's claim of ineffective assistance was without merit. The defendant argues that the trial court's *Krankel* inquiry on remand was again insufficient, by insisting that defense counsel gave no explanation as to his efforts in locating Timothy prior to the *second* trial, but rather provided the "same excuse" for failing to locate him and present his testimony for the *first* trial. We reject this contention. Our review of the hearing transcript shows that the trial court's questions and defense counsel's answers pertained specifically to counsel's efforts to locate Timothy prior to the *second* trial. The trial court stated on the record that it was aware of the reasoning behind this court's remandment and posed questions to defense counsel about his attempts to contact Timothy for "this trial." While the term "second trial" was not expressly used and though there are similarities between the unfolding of events in counsel's attempts to secure Timothy's presence for the first and second trials, it is clear from defense counsel's responses that they described his efforts to locate Timothy to testify at the second trial. As discussed, the record shows that at the *first* trial, defense counsel told the court that Timothy had contacted defense counsel on the day of trial after he had traveled to Chicago, Timothy had told counsel he needed a ride to court, but that Timothy had neither returned counsel's subsequent calls nor appeared in court. In contrast, at the April 16, 2013 hearing, defense counsel stated that he had "several" conversations with Timothy, but that Timothy never disclosed his location to him; that Timothy never came from out of state to Chicago "on the date of trial"; that Timothy failed to come to court despite saying he was available to testify; and that Timothy did not answer counsel's telephone calls. Based on our review of the record, it can be inferred from defense counsel's responses at the April 16, 2013 hearing that counsel was specifically recalling his efforts to locate Timothy for the *second* trial. Nothing in the record suggests otherwise. See *People v. Gaultney*, 174 Ill. 2d 410, 420 (1996) (a reviewing court "ordinarily presume[s] that the trial judge knows and follows the law unless the record indicates otherwise").

¶ 35    Because Timothy's whereabouts were unknown and he could not be located, the requirements of section 3 of the Witness Attendance Act, which allows for an out-of-state witness to be summoned to testify in an Illinois court, could not be complied with to secure Timothy's presence at the second trial. See 725 ILCS 220/3 (West 2008). It is important to note that the State also informed the court at the remandment hearing that its investigator could not locate Timothy and that the State had no information as to his whereabouts. Thus, where Timothy could not be located and he was unwilling to disclose his location, defense counsel could not have been deficient in failing to secure his presence or testimony at the second trial. See *People v. Williams*, 147 Ill. 2d 173, 247 (1991) (defense counsel cannot be faulted for failing to pursue a witness who could not be located or induced to testify, even though counsel was aware of the witness' existence); *People v. Lewis*, 97 Ill. App. 3d 982, 992 (1981) (counsel's failure to subpoena witness was not deficient, where the whereabouts of witness was unknown).

¶ 36    Notwithstanding the foregoing, the defendant primarily relies on *People v. Truly*, 230 Ill. App. 3d 948 (1992), and *People v. Morris*, 335 Ill. App. 3d 70 (2002), in arguing that defense counsel's performance was deficient. We find these cases to be inapposite. In *Truly*, the court found defense counsel to be "derelict in his duties" because he never made a reasonable

- 11 -

attempt to locate or subpoena four potential witnesses, whose names and addresses were provided by the defendant. *Truly*, 230 Ill. App. 3d at 950, 954-55. Unlike *Truly*, in the case at bar, no address for Timothy was available to defense counsel and his location could not be ascertained based on both defense counsel's and the State's efforts to find him. Compare *People v. Brooks*, 345 Ill. App. 3d 945 (2004) (defense counsel's failure to invoke the Uniform Rendition of Prisoners as Witnesses in Criminal Proceedings Act (725 ILCS 235/6 (West 2000)) for securing alibi witness at trial was not deficient performance, where defense counsel obtained telephone numbers of alibi witness but lost contact after numbers were disconnected; alibi witness was incarcerated out of state on day of defendant's trial; and counsel's motion for a continuance was denied). The defendant further relies on *Morris*. In *Morris*, in reversing the second-stage dismissal of the defendant's postconviction ineffective assistance of counsel claim and remanding for a third-stage evidentiary hearing, this court found that the defendant's petition contained unrebutted allegations that defense counsel failed to investigate or interview the alibi witnesses before trial; failed to disclose any witnesses in compliance with discovery before trial; and failed to subpoena or secure any witnesses to testify on behalf of defendant at trial. *Morris*, 335 Ill. App. 3d at 75, 83. Unlike *Morris*, the case at bar is on direct appeal and, thus, is in a different procedural posture than *Morris*, which involved a postconviction proceeding. We note that the defendant may wish to later file an ineffective assistance of counsel claim in a postconviction petition, should there actually be matters outside of the record that might support his claim regarding counsel's failure to present Timothy's testimony at the second trial. See *People v. Patrick*, 2011 IL 111666, ¶ 39 (a *Krankel* motion is not a substitute for a postconviction petition); see *People v. Phillips*, 383 Ill. App. 3d 521, 544 (2008) (claim of ineffective assistance of counsel requiring consideration of matters outside of the record is best resolved in a postconviction proceeding). The defendant cannot satisfy the first prong of the *Strickland* test and his ineffective assistance of counsel claim on this basis must fail.

¶ 37    We further reject the defendant's alternative arguments that the case should be remanded for the appointment of new counsel to undertake an independent investigation of this claim or for a third hearing to be held. We find the April 16, 2013 hearing to be complete and sufficient under *Krankel*, and the trial court did not err in concluding that the defendant's ineffective assistance claim was without merit and in declining to appoint new counsel to further investigate the defendant's claim. See *Patrick*, 2011 IL 111666, ¶ 32 (new counsel is not automatically required to be appointed in every case when a defendant presents a *pro se* posttrial motion alleging ineffective assistance of counsel); *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003) ("when a defendant presents a *pro se* posttrial claim of ineffective assistance of counsel, the trial court should first examine the factual basis of the defendant's claim. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed."). Accordingly, we reject the defendant's alternative arguments.

¶ 38    We next determine whether defense counsel was ineffective for failing to object to the admission of, and request a redaction of, opinion testimony contained in Marlon's prior written statement and grand jury testimony.

¶ 39    The defendant argues that defense counsel was ineffective for failing to object to the admission of, and request a redaction of, inadmissible opinion testimony in Marlon's prior

written statement and grand jury testimony. Specifically, he argues that the phrase "you stretched buddy," which was contained therein as something that was spoken by an unknown individual to the defendant a day and a half after the shooting, was interpreted by Marlon to mean that the defendant had killed the victim. The defendant argues that such opinion testimony was inadmissible and defense counsel failed to file a motion *in limine* to prevent the statements from coming into evidence at the second trial and he failed to object when those statements were presented to the jury.

¶ 40     The State counters that defense counsel was not ineffective for not objecting to the admission of Marlon's testimony in his prior written statement and grand jury testimony regarding the meaning of the phrase "you stretched buddy," which constituted proper lay opinion testimony related to an adoptive admission made by the defendant. The State argues that because the evidence was properly admitted at trial, any objections raised by defense counsel would have been futile. The State further maintains that the defendant could not establish that the testimony complained of prejudiced him so as to satisfy the *Strickland* test.

¶ 41     As discussed, at the second trial, Marlon denied being in the Pulaski and Division area when the victim was shot in 2008, denied knowing the victim, and denied observing anyone get shot on the night of the shooting. He also did not recall giving a prior written statement to ASA Pfeiffer or testifying before a grand jury. However, ASA Pfeiffer testified to obtaining Marlon's prior written statement in February 2008. Marlon's prior written statement, which was admitted into evidence and published to the jury in the second trial, stated that he observed the defendant firing a gun at the victim near the liquor store on January 9, 2008; that a day and a half after the shooting, Marlon was in a car with the defendant, Little Joe and an unknown individual; that the unknown individual told the defendant "yeah, you stretched buddy," which meant the defendant killed the victim; and that everyone laughed and the defendant nodded his head. Marlon's grand jury testimony, which was also introduced into evidence at the second trial, was substantially similar to the written statement mentioned in ASA Pfeiffer's testimony, except that the grand jury testimony did not recount the defendant's nodding after the unknown individual stated that the defendant had "stretched buddy."

¶ 42     The general rule is that hearsay, defined as " 'an out of court statement *** offered to establish the truth of the matter asserted,' " is inadmissible at trial. *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 33 (quoting *People v. Gonzalez*, 379 Ill. App. 3d 941, 954 (2008)). However, an exception exists to allow prior inconsistent statements of a testifying witness to be admitted to impeach the witness' credibility. *Donegan*, 2012 IL App (1st) 102325, ¶ 33. Section 115-10.1 of the Code of Criminal Procedure of 1963 (the Code) also allows for the admission as substantive evidence of a prior inconsistent statement made by a witness as long as he is subject to cross-examination and the statement (1) was made under oath at a trial, hearing or other proceeding, or (2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and the statement is proved to have been written or signed by the witness or the witness acknowledged under oath the making of the statement at a trial, hearing, or other proceeding. 725 ILCS 5/115-10.1 (West 2008). For the "personal knowledge" requirement to be satisfied, "the witness whose prior inconsistent statement is being offered into evidence must actually have seen the events which are the subject of that statement." (Internal quotation marks omitted.) *Donegan*, 2012 IL App (1st) 102325, ¶ 34.

¶ 43     Illinois Rule of Evidence 701 governs opinion testimony by lay witnesses: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is

limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Ill. R. Evid. 701 (eff. Jan. 1, 2011).

¶ 44        The defendant argues that the portions of Marlon's prior written statement and grand jury testimony regarding the meaning of the phrase "you stretched buddy," was inadmissible opinion testimony and should not have been allowed into evidence under section 115-10.1 of the Code. We disagree. First, we find that Marlon's prior inconsistent statements contained in his written statement and grand jury testimony were properly admitted as substantive evidence under section 115-10.1 of the Code. The prior written statement, which was signed by Marlon, described and explained the events relating to the shooting of which Marlon had personal knowledge because he was an eyewitness to the shooting. Marlon's grand jury testimony was also made under oath at the grand jury proceeding.

¶ 45        Second, the complained-of statements regarding the meaning of "you stretched buddy" contained in Marlon's prior written statement and grand jury testimony satisfied the requirements of Rule 701, where the opinions and inferences testified to were rationally based on Marlon's perception, were helpful to a clear understanding of Marlon's testimony or the determination of a fact in issue, and were not based on any scientific, technical, or other specialized knowledge. In *Donegan*, the State presented as substantive evidence the prior handwritten statement and grand jury testimony of two testifying witnesses, Crowder and Coleman. *Donegan*, 2012 IL App (1st) 102325, ¶ 40. In the prior statements, Crowder stated that codefendant Pikes told him that Pikes was going to " 'do some business,' " which Crowder interpreted to mean Pikes was " 'going over there to harm somebody' " or " 'go do a shooting.' " *Id.* Crowder also stated that several months later, Pikes said " 'why ain't nobody keeping going over there, finishing what he had left off with,' " which meant Moseley's murder. Coleman's prior statements also revealed that when Pikes said he was going to " 'get' " a car, he meant " 'steal' " a car to do a shooting; that when the defendant said he wanted retaliation he meant that he wanted to kill someone; that when the defendant ran through a gangway, he did so in order to retrieve some guns; and that the defendant's statement that " 'it's time,' " meant " 'to go kill.' " *Id.* The defendant in *Donegan*, like the defendant here, argued that the witnesses' prior statements constituted inadmissible opinion testimony to which defense counsel was ineffective for failing to object at trial. *Id.* The *Donegan* court rejected the defendant's claim, finding the prior statements to be admissible opinion testimony under Rule 701. *Id.* ¶ 43. The *Donegan* court specifically found the statements to be rationally based on the perception of the witnesses, and helpful to a clear understanding of their testimony or the determination of a fact in issue. *Id.* The *Donegan* court further noted that "[w]hen considering whether a witness's opinion as to what a declarant meant by a statement is admissible under Rule 701, circuit courts should consider the facts, circumstances, and context under which the statement was made." *Id.* We find *Donegan* to be instructive. Like *Donegan*, here, Marlon's prior statements that the phrase "you stretched buddy" meant the defendant killed the victim, satisfied the criteria set forth under Rule 701. The statement "you stretched buddy" was made by an unidentified declarant to the defendant in the presence of Marlon only a day and a half after the shooting, during a conversation in which the unidentified declarant "brung [*sic*] up the incident." Like *Donegan*, Marlon's opinion testimony regarding the meaning of the statement "you stretched buddy" was properly admitted, where it was

rationally based on Marlon's perception and own understanding of the phrase, rather than speculation about defendant's understanding of the phrase, and where it was helpful to a clear understanding of Marlon's testimony and not based on any scientific, technical, or other specialized knowledge. See *People v. Holveck*, 141 Ill. 2d 84 (1990) (proper for babysitter of alleged victim of sexual offense to explain the meaning of the phrase "stranger danger" used by the child victim, where testimony was based on her personal knowledge of the particular program being conducted by police department to make children aware of dangers posed by strangers); *People v. Lewis*, 147 Ill. App. 3d 249 (1986) (testimony by mother stating that "cootch" meant vagina, "bootie" meant buttocks, and "his thing" meant defendant's penis, was admissible after mother testified that her daughter had told her that defendant had rubbed his penis on daughter's "bootie" and "cootch" and had made daughter suck "his thing," where mother had personal knowledge of meanings she had taught daughter to associate with those words).

¶ 46    Third, because we find Marlon's opinion testimony regarding the meaning of "you stretched buddy" to be properly admitted, the defendant's nod in response to the declarant's "you stretched buddy" statement, as detailed in Marlon's written statement, could constitute a tacit admission. See *People v. Campbell*, 332 Ill. App. 3d 721, 734 (2002) (a tacit admission "may be admissible as an exception to the hearsay rule if sufficient evidence supports a finding that, in light of the totality of the circumstances, a defendant remained silent when faced with an incriminating statement, which, if untrue, would normally call for a denial").

¶ 47    Because Marlon's prior written statement and grand jury testimony were properly admitted under section 115-10.1 of the Code, and his opinions therein as to the meaning of "you stretched buddy" were properly admitted as lay opinion testimony under Rule 701, we find that defense counsel was not deficient for failing to object and request a redaction of the complained-of statements. See *People v. Mercado*, 397 Ill. App. 3d 622, 634 (2009) (defense counsel is not required to make losing motions or objections in order to provide effective legal assistance). Moreover, in light of our ruling that the prior inconsistent statements were properly admitted, we necessarily reject the defendant's arguments regarding "double hearsay" where those arguments are based on the presumption that Marlon's prior statements were inadmissible.

¶ 48    Further, defendant's ineffective assistance of counsel claim fails where he cannot establish the prejudice prong required by *Strickland*. Therefore, we hold that the defendant's ineffective assistance of counsel claim on this basis must fail.

¶ 49    We next determine whether the trial court erroneously admitted other-crimes evidence at trial when it allowed the jury to receive and review a portion of Marlon's prior written statement disclosing that the defendant "carries different types of guns." We review this issue under an abuse of discretion standard. See *People v. Hale*, 2012 IL App (1st) 103537, ¶ 10.

¶ 50    The defendant argues that the trial court abused its discretion in allowing the jury to receive improper and highly prejudicial other-crimes evidence by refusing to redact the portion of Marlon's prior written statement in which he alluded to the defendant's carrying of guns. He argues that the complained-of statements constituted other-crimes evidence, which had no bearing on the jury's determination in this case. He further argues that the trial court abused its discretion in failing to provide the jury with a limiting instruction regarding the other-crimes evidence. He contends that the improper admission of such evidence was not harmless error.

¶ 51    The State argues that the complained-of statements did not constitute other-crimes evidence. The State contends that even if they were considered other-crimes evidence, such evidence was properly admitted because it was relevant for a purpose other than showing the defendant's propensity to commit crimes. The State further argues that the defendant's argument regarding the trial court's failure to instruct the jury regarding the purported other-crimes evidence is forfeited for review on appeal, where the defendant never sought a limiting instruction at trial and failed to raise this claim of error in a posttrial motion. Even if it was error to admit the complained-of statements, the State argues that it was harmless error.

¶ 52    At the second trial, Marlon testified that he did not recall giving a prior written statement about his observations of the shooting to ASA Pfeiffer; he denied that the signature on the prior written statement belonged to him; and he testified that he did not recall signing the statement, having it read back to him, or testifying in front of the grand jury. As noted, Marlon's prior written statement was presented to the jury during the second trial. As Marlon's prior written statement was admitted into evidence and published to the jury in the second trial, defense counsel objected to the portion of the statement that described the defendant as carrying other guns, on the grounds that it was inadmissible other-crimes evidence. The State responded that it had no objection to refraining from reading that portion of the statement to the jury. Ultimately, the State did not have the objectionable portion of the prior written statement read to the jury. However, the trial court ruled that when the written statement was to be given to the jury for deliberations, there would be no alterations because Marlon's testimony at the second trial raised the issue of whether he had actually signed the document. The trial court also rejected defense counsel's request to alter the document to exclude the portions regarding the other-crimes evidence because according to the court, such evidence is admissible for "any other purpose than propensity." After closing arguments, the parties discussed which exhibits would go to the jury. Defense counsel objected to the jury receiving Marlon's unredacted prior written statement. The trial court ruled that Marlon's written statement would go to the jury in its entirety so that the jury would be able to determine whether Marlon actually made the statement.

¶ 53    "The term 'other-crimes evidence' encompasses misconduct or criminal acts that occurred either before or after the allegedly criminal conduct for which the defendant is standing trial." *People v. Spyres*, 359 Ill. App. 3d 1108, 1112 (2005). The complained-of statements in Marlon's prior written statement read as follows: Marlon had "seen [the defendant] with a gun before. [The defendant] carries different types of guns, 9 millimeters, automatics and revolvers." As noted, although the complained-of statements were not read to the jury during ASA Pfeiffer's testimony, they were not redacted from Marlon's prior written statement that was ultimately given to the jury for deliberations. We cannot conclude that the complained-of statements constituted other-crimes evidence, as the defendant claims. Those statements did not describe any misconduct or criminal acts committed by the defendant, but rather only Marlon's observations that he had seen the defendant in possession of certain guns at some unknown time. The defendant argues in his reply brief that the defendant's alleged possession of the guns was a crime because it was illegal to possess handguns in Chicago at the time of Marlon's prior written statement in 2008, and points out that his prior felony conviction prohibited him from being in possession of any weapons under Illinois law. However, the complained-of statements provided no additional relevant information regarding *where* and *when* Marlon had previously seen the defendant in possession of these weapons, and it could

not be presumed that the alleged possession occurred in Chicago or that it occurred after the defendant had already been convicted of his prior felony offense. Further, no evidence of the defendant's prior felony conviction was ever presented at the second trial and, thus, it cannot be said that the jury would have been aware of any misconduct or criminal acts by the defendant that occurred either before or after the shooting for which the defendant was tried in the instant case. Thus, it requires many assumptions to determine that the complained-of statements were other-crimes evidence. We decline to make those assumptions and thus hold that the statements did not constitute other-crimes evidence.

¶ 54    Moreover, even assuming, *arguendo*, that the trial court should have allowed redaction of the contested portion of Marlon's prior written statement before giving it to the jury, or should have instructed the jury on the limited usage of other-crimes evidence (despite defense counsel's failure to request such instruction at trial), we find the error, if any, to be harmless. Strong evidence presented at the second trial established that both Jackson and Bass were eyewitnesses to the shooting and observed the defendant shoot the victim. See *People v. Nieves*, 193 Ill. 2d 513, 530 (2000) (improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial based upon its admission); see also *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 30 (where the identification of defendant constitutes the central question in a criminal prosecution, the testimony of even a single witness is sufficient to convict where the witness is credible and viewed the accused under conditions permitting a positive identification to be made). Accordingly, we hold that the defendant is not entitled to relief on this basis.

¶ 55    We next determine whether the trial court failed to comply with the requirements of Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) during *voir dire*.

¶ 56    The defendant argues that a new trial–a third trial–is warranted where the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) during *voir dire*. Specifically, he contends that the trial court recited the four *Zehr* principles to the venire as a group, but only asked the potential jurors whether they "had any problems" with the first three principles, and only asked if anyone would hold the defendant's decision not to testify against him. He maintains that these questions pertained only to the potential jurors' willingness to *accept* the law, but did not pertain to their ability to *understand* it. The defendant concedes that this issue was not properly preserved for appeal, but argues that the plain error doctrine applied to circumvent forfeiture.

¶ 57    The State argues that the defendant's claim of Rule 431(b) error is forfeited for review on appeal, does not amount to plain error, and is not a basis for reversal. The State maintains that no error occurred because the trial court properly admonished the potential jurors under Rule 431(b). The State argues that even if an error occurred, it did not rise to the level of plain error because the evidence in this case was not closely balanced.

¶ 58    We agree that the defendant has forfeited this issue for review on appeal. See *People v. Herron*, 215 Ill. 2d 167, 175 (2005) (a defendant who fails to make a timely trial objection and include the issue in a posttrial motion forfeits the review of the issue). However, the plain error doctrine allows a reviewing court to consider unpreserved issues when either: (1) the evidence is close, regardless of the seriousness of the error; or (2) the error is so serious, regardless of the closeness of the evidence. *Id.* at 178-79; *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step in a plain error analysis is to determine whether an error occurred at all. *People v. Hudson*, 228 Ill. 2d 181, 191 (2008).

¶ 59 Rule 431(b) is a codification of our supreme court's holding in *Zehr*, 103 Ill. 2d 472, and states as follows:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

¶ 60 A review of the record shows that during *voir dire*, the trial court instructed the venire about the defendant's presumption of innocence; the burden of proof placed on the State; and that the defendant was not required to prove his innocence. The trial court then asked the venire whether they "had any problems" with these first three principles. The court next informed the venire that the defendant was not required to testify, and asked "[i]f the defendant decides not to testify, is there anyone here who believes that regardless of what I have just said, you would hold that decision against the defendant?" None of the members of the venire answered in the affirmative.

¶ 61 In *People v. Thompson*, 238 Ill. 2d 598 (2010), our supreme court held that the trial court failed to comply with Rule 431(b) because it admonished members of the venire regarding only three of the four *Zehr* principles, asked the prospective jurors whether they "understood" two of the principles, but failed to ask if they "accepted" all four principles. The *Thompson* court stated that Rule 431(b) required "questioning on whether the potential jurors both understand and accept each of the enumerated principles." *Id.* at 607. Nevertheless, the *Thompson* court found that this error did not warrant an automatic reversal of the defendant's conviction, nor did it rise to the level of plain error because the defendant had not presented any evidence that the Rule 431(b) violation resulted in a biased jury. *Id.* at 611.

¶ 62 In the instant case, the defendant does not dispute that the trial court addressed each of the four *Zehr* principles with the venire. Rather, he takes issue with the *phraseology* used by the trial court in questioning the prospective jurors. The defendant contends that the court's questions pertained only to the potential jurors' willingness to *accept* the law, but did not pertain to their ability to *understand* it. We find this court's holding in *People v. Lampley*, 2011 IL App (1st) 090661-B, to be highly instructive.

¶ 63 In *Lampley*, this court found that the trial court erred when it informed jurors of the four Rule 431(b) principles and then engaged in questioning that conflated the principles. Specifically, the trial court inquired about the first three principles as follows: " '[T]he defendant is presumed innocent and does not have to offer any evidence on his own behalf but must be proven guilty beyond a reasonable doubt by the State. Does anyone here have any problems with those concepts?' " *Id.* ¶ 5. The court then inquired about the fourth principle, asking: " 'As I have also previously stated, the defendant does not have to testify on his own behalf. If the defendant decides not to testify, you must not hold that decision against the defendant. If the defendant decides not to testify, is there anyone here who believes that,

regardless of what I have just said, you would hold that decision against the defendant?' " *Id.* The *Lampley* court found that the trial court's inquiry was insufficient pursuant to *Thompson*, explaining that the court "should have followed a straightforward questioning of the *Zehr* principles as outlined by Rule 431(b) and, as a result, committed error." *Id.* ¶ 35. However, in ruling that reversal was not warranted, the *Lampley* court went on to find that the error did not rise to the level of plain error where the evidence against the defendant was overwhelming and the error was not so serious as to overcome the overwhelming evidence. *Id.* ¶ 36.

¶ 64 We find the facts in the case at bar to be almost identical to those in *Lampley*. Like *Lampley*, the trial court here admonished the potential jurors on all four *Zehr* principles, in the same manner as the trial court in *Lampley*. Thus, following the sound reasoning in *Lampley*, we conclude that the trial court in the instant case did not sufficiently comply with Rule 431(b) and therefore erred. Having found that an error occurred, we examine whether the error rises to the level of plain error. Because the defendant only argues plain error under the closely-balanced-evidence prong of the plain error doctrine, we limit our analysis to the first prong of the plain error test. See *Herron*, 215 Ill. 2d at 178 (reviewing court may consider unpreserved issues under the closely-balanced-evidence prong of the plain error doctrine if "the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence"). Like *Lampley*, we find that the evidence in this case was not closely balanced. In fact it was overwhelming. The jury was presented evidence by three eyewitnesses who had independently identified the defendant as the shooter. Thus, we cannot say that the guilty verdict may have resulted from the error committed by the court during *voir dire*, and not the overwhelming evidence. Therefore, the plain error doctrine does not apply to reach this forfeited issue.

¶ 65 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 66 Affirmed.