2022 IL App (1st) 200420-U

SECOND DIVISION
October 25, 2022

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County |
| v. | ) ) | No. 12 CR 106602 |
| JEROME WILLIAMS, | ) ) | Honorable Patrick Coughlin, |
| Defendant-Appellant. | ) ) | Judge Presiding |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Though it was error to admit certain details of other-crimes evidence, error was harmless.

¶ 2    A jury found Jerome Williams guilty of murder, aggravated vehicular hijacking, and aggravated discharge of a weapon. During the trial, the court admitted testimony regarding other-crimes evidence. On appeal, defendant argues that the trial court abused its discretion in admitting excessive details as to that evidence. While we agree that the details went beyond what was permissible, that error was harmless and did not deny defendant a fair trial, as the outcome would have been the same absent the excessive details. We affirm defendant's conviction.

¶ 3                                    BACKGROUND

¶ 4      Defendant, along with his cousin Diantoine McGee (who was tried separately), was indicted following an incident on October 12, 2011, in Harvey, Illinois. The State proceeded on one count of aggravated vehicular hijacking, one count of aggravated discharge of a firearm against Brian Marr, and three counts of the first-degree murder of Erica Pittman.

¶ 5      Before trial, the State filed an amended motion to allow proof of other crimes that defendant committed in the Chicago area, arguing the incidents were relevant to show defendant's identity, intent, knowledge, and *modus operandi*.

¶ 6      First, the State submitted defendant's two convictions for aggravated vehicular hijackings that occurred on November 8 and 9, 2006. In each case, the victims were parking their vehicles when defendant and co-offenders approached, displayed firearms, and took the vehicles.

¶ 7      Second, the State alleged that defendant robbed an off-duty police officer on August 28, 2011. According to the State, the officer was parking his vehicle when defendant approached, brandished a firearm, and took with his wallet, jewelry, and .38-caliber service revolver.

¶ 8      Third, on October 2, 2011, defendant allegedly approached Rubin Williams as he parked his Buick Allure.  (We will refer to this individual as "Rubin" to avoid confusion, as he shares defendant's last name.) Defendant brandished a .38-caliber revolver and drove away in the Buick before abandoning it with his cell phone inside. Rubin identified defendant in a lineup.

¶ 9      Fourth, the State alleged that on October 4, 2011, David Latimer was in his Chevrolet Monte Carlo when defendant and McGee arrived in the Buick. Defendant shot Latimer and, with McGee, drove away in the Monte Carlo. Defendant confessed to possessing a .38-caliber revolver during the offense. Forensic evidence established that the bullets that struck Latimer and killed Pittman were fired by the same weapon.

¶ 10    Defendant filed a response, arguing that the other-crimes evidence was dissimilar to the instant case and overly prejudicial.

¶ 11    Following a hearing, the trial court granted the State's motion as to the incidents involving Rubin and Latimer. The court found "no doubt that prejudice does accrue," but the incident involving Latimer was "very probative" because it "could go to identification of the offenders" given the "nexus" with the case involving Rubin.

¶ 12    Defendant then filed motions *in limine* to bar evidence of prior bad acts and pending cases, arguing the alleged conduct was irrelevant and implied a propensity for crime. The court denied both motions, as the vehicles and bullets involved in the offenses against Rubin and Latimer were "directly on point" for "proving identity."

¶ 13    The cause proceeded to trial, where the court admonished the jury that it would hear evidence that defendant was "involved in offenses other than those charged." The court explained:

> "This evidence *** will be received on the issues of the defendant's identification,
> *modus operandi* and accomplice liability and may be considered by you only for those
> limited purposes. It is for you to determine whether the defendant was involved in those
> offenses and if so [what] weight should be given to this evidence on those issues."

¶ 14    Rubin testified that on October 2, 2011, about 10:45 p.m., he was exiting his Buick Allure near his apartment. A man with a firearm approached and threatened to kill Rubin if he did not surrender his keys. Rubin complied, and the man left in the Buick. Later, Rubin met Calumet Park police detective John Shefcik and identified the man in a photo array and physical lineup. On cross-examination, Rubin testified that he viewed the firearm for about 20 seconds. On redirect examination, Rubin testified that the firearm was a .38-caliber revolver.

¶ 15    Shefcik testified that on October 4, 2011, he learned the Buick had been recovered in Riverdale and towed. Shefcik searched a phone found in the vehicle and discovered defendant's name and photographs.

¶ 16    Illinois State Police sergeant Cary Morin testified that he collected the phone and fingerprints from the towed vehicle. On cross-examination, Morin testified that no fingerprints matched defendant. On redirect examination, he testified that one print matched Diantoine McGee.

¶ 17    Latimer testified that he was on felony probation at the time of trial. Between 1 and 2 a.m. on October 4, 2011, he was parking his Chevrolet Monte Carlo at a house in Riverdale. A Buick drove past, striking another vehicle. As Latimer exited the Monte Carlo, he saw a "flash" and a bullet struck his left cheek. Paramedics took Latimer to Christ Hospital. The State questioned Latimer as follows:

> "Q. How long did you stay [at the hospital], Mr. Latimer?
>
> A. For about seven days.
>
> Q. And did you learn *** what your injury was?
>
> A. Yeah, I was shot in the face.
>
> Q. Did you learn whether or not anything was taken out of your body?
>
> A. A few teeth. I lost a few teeth. Not a lot, just a lot of pain.
>
> Q. Was a bullet ever taken out of your face *** or neck area, sir?
>
> A. The bullet was—they said I *** swallowed the bullet. It was taken out of my neck."

¶ 18    Outside the presence of the jury, defendant moved to strike Latimer's testimony and for a mistrial. According to defendant, Latimer's testimony was improper as proof of other crimes because he failed to identify defendant as his assailant. The State responded that the bullet

extracted from Latimer matched the firearm used against Pittman, and defendant's cell phone was recovered from the Buick used during the attack on Latimer. The court denied the motions.

¶ 19    Nancy Kummer, an administrative assistant at Christ Hospital, testified that she received a bullet removed from Latimer and gave it to Riverdale police lieutenant Brad Bailey on October 21, 2011.

¶ 20    Bailey testified that he sent the bullet to the Illinois State Police Crime Lab. On October 24, 2011, Bailey *Mirandized* and interviewed defendant, who stated that he was driving with his cousin and observed a Monte Carlo. Defendant's cousin shot the driver, and defendant "stepp[ed] over" the driver to enter the Monte Carlo. Defendant and his cousin left in the Monte Carlo, but defendant forgot his cell phone in the vehicle they were previously driving.

¶ 21    Regarding the charges at issue in this trial, Brian Marr testified that, on October 12, 2011, around 12:45 a.m., he and Pittman were in her Lincoln Continental in the driveway of Marr's home in Harvey, Illinois. Marr slept in the front passenger seat and Pittman sat in the driver seat. Two armed men approached. One of the men, whose face was partially covered with a bandana, stood by the driver's side and said, "[W]hat you think this is a game? Get out." The man fired twice into the vehicle, striking Pittman. The other man, whose face was not covered, pulled Marr from the vehicle, and the two men entered the vehicle and drove away. On October 21, 2011, Marr viewed a lineup at the police station and identified the man who pulled him from the vehicle but could not identify the individual on Pittman's side of the vehicle.

¶ 22    Montel Tate-Bedell testified that he had been convicted of residential burglary. On October 12, 2011, Tate-Bedell was on Marr's porch, and Marr and Pittman were in Pittman's Lincoln. Two armed men with bandanas over their faces approached the Lincoln. One man pointed his firearm at the porch, said not to move, and walked towards the Lincoln. Tate-Bedell

heard a gunshot, ran into the house, and saw the Lincoln drive away. Pittman, who had blood on her shirt, walked toward the porch, and Tate-Bedell called the police.

¶ 23    On cross-examination, Tate-Bedell testified that he saw the face of the man who pointed the firearm at the porch. On redirect examination, he testified that on October 22, 2011, he identified that man in a physical lineup.

¶ 24    Illinois Department of Corrections agent James Garrett testified that, on October 20, 2011, he helped execute a warrant for defendant at McGee's parole residence. Defendant fled but was arrested. Garrett discovered McGee in the garage, hiding behind a Lincoln Continental that had been "stripped." Garrett ran the license plate and learned the vehicle was carjacked in Harvey.

¶ 25    Cook County Sherriff's Office investigator Matthew Goral testified that he found a .38-caliber revolver in the house. The weapon, which bore serial number 849002, had been reported stolen, and Goral returned it to the owner.

¶ 26    Assistant State's Attorney Terri Gleason testified that on October 24, 2011, she *Mirandized* and interviewed defendant at the Calumet Park police station and memorialized his statement regarding the incident on October 12, 2011. Defendant reviewed and signed the statement, which was published.

¶ 27    In that statement, defendant explained that around midnight, he and McGee were walking and decided to rob a man and woman in a parked Lincoln. Defendant brandished a firearm and instructed people on a nearby porch "not to move." Then he pointed the firearm at the woman, who was in the driver's seat. The woman said, "you think you're the only one with a gun." At that point, the man, who was in the front passenger seat, reached toward the floor of the vehicle. Defendant thought the man was retrieving a firearm, so he fired a "warning shot" into the

vehicle. McGee, who was armed, pulled the man from the vehicle and the woman also exited. Defendant entered the driver's seat, McGee entered the passenger's seat, and they drove to McGee's house.

¶ 28    On October 26, 2011, Gleason *Mirandized* and interviewed defendant at the Riverdale police station and memorialized his statement regarding the incident on October 4, 2011 (the Latimer carjacking). Defendant reviewed and signed the statement, which was published.

¶ 29    Defendant stated that he and McGee were driving a Buick they stole a few nights earlier and encountered a Monte Carlo that McGee wanted to steal and sell. Defendant drove alongside the Monte Carlo, and McGee shot the driver in the face with a .38-caliber revolver that defendant and McGee shared. The driver fell from the vehicle. Defendant stepped over Latimer and entered the driver's seat, McGee entered the passenger's seat, and they drove to McGee's house. Defendant left his cell phone in the Buick. The next day, defendant and McGee tried to sell the Monte Carlo in Chicago, but police towed it.

¶ 30    Harvey police sergeant Shane Gordon testified that he interviewed defendant on December 15, 2011, at Stateville Correctional Facility about the crime at issue here. Gordon *Mirandized* defendant but did not advise him that the interview was being filmed. The State published excerpts of the video recording, which are included in the record on appeal and depict Gordon questioning defendant about Pittman's shooting. Defendant's answers comport with his statement to Gleason, and he adds that, during the incident, he carried a "38." On cross-examination, Gordon testified that five individuals, including Tate-Bedell and Marr, viewed a lineup containing defendant, but none identified him as the offender.

¶ 31    Cook County chief medical examiner Dr. Ponni Arunkumar, who reviewed Pittman's autopsy, testified that Pittman died on November 2, 2011. Pittman had gunshot wounds to her

left chest and left arm. Pittman's cause of death was multiple gunshot wounds; the manner of death was homicide.

¶ 32    Illinois State Police investigator Darrell Stafford testified that he attended Pittman's autopsy and received a bullet recovered from her body. On cross-examination, Stafford testified that he transferred the bullet to the Harvey police.

¶ 33    Cook County Sheriff inspector John Sullivan testified that in August 2017, he was tasked with locating a .38-caliber firearm bearing serial number 849002. Sullivan tracked the weapon to Virginia, purchased it, and returned it to the sheriff's office in Cook County.

¶ 34    Illinois State Police forensic scientist Kurt Zielinski testified that he analyzed the firearm and found that it fired the bullets recovered from Latimer and Pittman.

¶ 35    During the jury instruction conference, the court discussed an instruction regarding other-crimes evidence. The court stated that "over the defense's objection," the jury would be instructed that other-crimes evidence could only be considered for identification, *modus operandi*, and accountability. Following closing arguments, the court issued the instruction.

¶ 36    The jury found defendant guilty of first-degree murder, aggravated vehicular hijacking, and aggravated discharge of a firearm. Defendant moved for a new trial, arguing, among other things, that the trial court erred in allowing the other-crimes evidence. The court denied the motion.

¶ 37    Following a hearing, the court merged the first-degree murder counts and imposed consecutive prison terms of 60 years for first-degree murder, 25 years for aggravated vehicular hijacking, and 7 years for aggravated discharge of a firearm. Defendant filed a motion to reconsider sentence, which the court denied.

¶ 38                                                ANALYSIS

¶ 39     Defendant argues that the court erred in allowing the admission of detailed, graphic

evidence relating to the Latimer carjacking. He does not deny that evidence of the Latimer

carjacking was relevant to the issue of identity; he only complains that the amount of detail heard

by the jury was excessive, unnecessary, and ultimately prejudicial.

¶ 40     Other-crimes evidence is inadmissible merely to prove bad character or propensity to

commit crime. *People v. Wilson*, 214 Ill. 2d 127, 135-36 (2005). Such evidence is, however,

admissible to establish motive, intent, identity, knowledge, absence of mistake, or *modus*

*operandi*, among other legitimate purposes. *People v. Dabbs*, 239 Ill. 2d 277, 283 (2010). When

determining admissibility, the trial court must weigh probative value against potential for

prejudice. *People v. Moss*, 205 Ill. 2d 139, 156 (2001). The admission of other-crimes evidence

is within the discretion of the trial court and will not be reversed absent an abuse of that

discretion. *People v. Ward*, 2011 IL 108690, ¶ 21.

¶ 41     To be admissible, the other crimes must bear a threshold similarity to the crime charged

to ensure "that it is not being used solely to establish the defendant's criminal propensities."

*People v. Bartall*, 98 Ill. 2d 294, 310 (1983). But unless the State's purpose is to establish *modus*

*operandi*, the threshold for similarity is relaxed. *People v. Cruz*, 162 Ill. 2d 314, 349 (1994).

Here, the State introduced the evidence to establish identity. Thus, for our purposes, "mere

general areas of similarity will suffice." *People v. Illgen*, 145 Ill. 2d 353, 373 (1991).

¶ 42     We agree with the State that, generally speaking, the facts of the Latimer carjacking were

sufficiently similar to the carjacking at issue to warrant admission on the issue of identity. But

because defendant does not claim otherwise, we will not belabor that point. We instead move to

defendant's complaint that, while the fact of the Latimer carjacking was itself admissible, the

court erred in allowing the State to introduce unnecessarily detailed and prejudicial evidence regarding that other carjacking.

¶ 43    Because other-crimes evidence carries a great risk of prejudice, the evidence admitted should be confined to only those details directly relevant to the issue for which the evidence was admitted. See *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 72 (requiring "careful limitation of the details of the other crimes to what is necessary to 'illuminate the issue for which the other crime was introduced.'" (quoting *People v. Nunley,* 271 Ill.App.3d 427, 432 (1995)); *People v. Thigpen*, 306 Ill. App. 3d 29, 37 (1999). In cases involving identity, details of other-crimes evidence "should be confined to such details as show the opportunity for identification and not the details of the crime." *People v. Butler*, 31 Ill. App. 3d 78, 80 (1975).

¶ 44    Here, what connected the Latimer carjacking to the one at issue were the following facts: (1) defendant was involved in the Latimer carjacking; (2) both carjackings involved the shooting of a victim, or at a minimum the firing of a gun; (3) a bullet was recovered from the Latimer carjacking; and (4) the recovery of the bullet allowed for ballistics testing that matched the gun in the Latimer carjacking to the gun used in the carjacking at issue.

¶ 45    As defendant correctly notes, the jury did not need to know such details as the fact that Latimer was shot in the face, causing him to lose several teeth and ultimately "swallow" the bullet, or the length of time Latimer spent in the hospital, or even that defendant callously stepped over Latimer to get into Latimer's car and drive away. None of those details assisted the trier of fact on the issue of identity and served no valid evidentiary purpose. We agree with defendant that it was error to introduce these unnecessary details.

¶ 46    The question thus becomes whether the error in admitting these unnecessary details rises to the level of reversible error, or whether the error was harmless.

¶ 47    The parties disagree on how we should measure the harmlessness of the error here. Defendant claims that the State bears the burden of proving that the error was harmless beyond a reasonable doubt, the standard of review applicable to errors of a constitutional magnitude, such as violations of the Confrontation Clause or *Apprendi* errors. See, *e.g.*, *Chapman v. California*, 386 U.S. 18, 23 (1967) (Confrontation Clause); *People v. Thurow*, 203 Ill. 2d 352, 363 (2003) (*Apprendi* errors). The State, on the other hand, claims that any error here would be a mere evidentiary error at trial, thus placing the burden on defendant to demonstrate that "there is no reasonable probability that the jury would have acquitted the defendant" without the evidence at issue. *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990).

¶ 48    We are inclined to side with the State here, for we are aware of no decision (nor have we been cited one) expressly indicating that an error in admitting other-crimes evidence rises to the level of constitutional error. And that is particularly true given that, here, defendant does not dispute the admissibility of the other-crimes evidence, but instead merely argues that *too much detail* concerning the other-crimes evidence was introduced. Still, we also acknowledge that our supreme court, while never outright equating the improper admission of other-crimes evidence with constitutional error, did refer to the standard for constitutional errors when it found that the admission of other-crimes evidence was "harmless beyond a reasonable doubt." *People v. Nieves*, 193 Ill. 2d 513, 531 (2000).

¶ 49    These standards of review, to be sure, are different, and the outcome of a case could turn on which standard we employ. See *in re E.H.*, 224 Ill. 2d 172, 181 (2006) ("there could theoretically exist a narrow set of cases in which admission of the same evidence is harmless if considered as an evidentiary error, but not harmless if evaluated pursuant to the constitutional error standard."). But this case is not one of them. So we need not resolve any

conflict in the case law over the standard of review. Even if we employed the more stringent standard of constitutional error, we would find that the error was harmless beyond a reasonable doubt.

¶ 50    We recognize that "the erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal." *People v. Lindgren*, 79 Ill. 2d 129, 140 (1980). But we emphasize again that defendant does not challenge the admissibility of the evidence of either the Rubin or Latimer carjackings. So even defendant concedes that the jury was entitled to hear that defendant was part of each of those crimes, and that the firearm used in the Latimer carjacking was likewise used in the carjacking at issue. Defendant merely complains that the jury heard too many details of one of those two carjackings, the one involving Latimer.

¶ 51    The evidence in this case was substantial. The jury not only heard that defendant was implicated in another carjacking involving the same firearm as the one used here, not to mention the same co-offender, but the jury also heard that defendant confessed to the carjacking at issue to more than one law enforcement official on different dates. True, the jury did not need to know the additional details of Latimer being shot in the face, the bullet lodging in his neck, the length of Latimer's hospitalization, or the fact that defendant stepped over Latimer's body to get into the stolen vehicle. But we could not possibly find that these nasty details played any meaningful role in the verdict. The evidence of defendant's guilt was overwhelming, and the improper admission of these specific details did not deny him a fair trial. So even were we to equate the error with constitutional error, we would find no basis for reversal, as the error here was harmless beyond a reasonable doubt.

¶ 52                                        CONCLUSION

¶ 53      Defendant's conviction is affirmed.

¶ 54      Affirmed.